## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

Civil Action No. 1:23-cv-00438-RMR-SBP

ILAN BOUZAGLO, individually and on behalf of others similarly situated,

     Plaintiff,

v.

INSPIRATO INCORPORATED,
BRENT HANDLER, and
R. WEBSTER NEIGHBOR,

     Defendants.

---

### RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

**Susan Prose, United States Magistrate Judge**

     This matter comes before the Court for a Report and Recommendation on Defendants' (collectively, "Inspirato") October 27, 2023 Motion (ECF No. 33) to Dismiss Amended Class Action Complaint, which was referred to the undersigned by order dated October 30, 2023. ECF No. 35. The undersigned considers the Motion pursuant to 28 U.S.C. § 636(b). After reviewing the Motion, the entire case file, and the applicable case law, the court **RECOMMENDS** that the Motion be **granted**.

### BACKGROUND

     The Plaintiffs' Amended Class Action Complaint (ECF No. 31) is somewhat impenetrable, filled with lengthy quotes from other documents with little guidance, but its pertinent allegations can be succinctly stated. In February 2022, Inspirato became a publicly-

1

traded corporation through a merger with a pre-existing private business entity. *Id.*, ¶ 16. On May

12, 2022, Inspirato filed a Form 8-K with the Securities and Exchange Commission ("SEC"),

reporting its revenues and profits (and losses) for the first financial quarter of 2022. *Id.*, ¶ 28. The

following day, Inspirato filed its Form 10-Q with the SEC, tendering various financial

statements, along with information about Inspirato's implementation of "generally accepted

accounting principles" ("GAAP"). *Id.*, ¶ 29. The Form 10-Q noted that in 2019, the Financial

Accounting Standards Board issued an advisement known as "ASC 842" about how certain

kinds of leases—a common aspect of Inspirato's business practices—should be accounted for.

Inspirato's May 2022 Form 10-Q indicated that the company "adopted ASC 842 as of January 1,

2022" and provided certain information about how Inspirato had implemented the instructions of

ASC 842.[1] On August 8, 2022, Inspirato filed its Form 8-K covering the second quarter of 2022,

and on August 10, 2022, filed its Form 10-Q for that quarter, reporting similar information as that

disclosed on the May 2022 forms. *Id.*, ¶ 30-31.

      In November 2022, Inspirato filed its Forms 8-K and 10-Q for the third quarter of 2022.

In those forms, Inspirato reported that its Audit Committee had determined that the financial

statements it had issued for the first and second quarters of 2022—those statements in the May

---

[1] The May 2022 Form 10-Q also disclosed that Inspirato had discovered "material weaknesses in internal control over financial reporting" as of March 31, 2022. Those weaknesses were attributed to the fact that Inspirato "lacked a sufficient number of personnel with the appropriate level of knowledge and experience in the application of GAAP, including the application of new accounting standards," among other defects. Nevertheless, the Form 10-Q set forth the remediation measures that Inspirato had undertaken to address those weaknesses and advised that "notwithstanding the material weaknesses," the financial statements included in the May 2022 Form 10-Q "fairly state, in all material respects, our financial position . . . in conformity with GAAP." *Id.*, ¶ 29.

and August 2022 Forms 8-K and 10-Q—"should no longer be relied upon." Inspirato explained that "it had determined that it had incorrectly applied ASC 842 to its accounting for leases during those periods and that, as a result, it had understated its liabilities by as much as 9% in its earlier filings. Inspirato explained that it "intends to restate" the financial statements for those time periods in amended filings and recommended that investors not rely on the existing Form 8-K and 10-Q for those periods. *Id.*, ¶ 43. As a result of the November 2022 advisement, Inspirato's stock price declined by 11.89%.[2] *Id.*, ¶ 45.

The Plaintiffs, a class comprised of Inspirato's shareholders during the period at issue, bring this action alleging claims of securities fraud against Inspirato and its executives pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, and "control person liability" claims pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against the individual Defendants. The Plaintiffs allege that because of Inspirato's misapplication of ASC 842, the financial information contained in the Forms 8-K and 10-Q for the first and second quarters of 2022 were materially misleading. The Plaintiffs further allege that the individual Defendants responsible for those filings, Mr. Handler as Inspirato's Chief Executive Officer and Mr. Neighbor as Inspirato's Chief Financial Officer, made those false statements with scienter. In support of their scienter allegations, the plaintiffs rely on information derived from two "confidential witnesses" employed by Inspirato. Confidential Witness 1 is

---

[2] Subsequent filings and public statements caused the stock to decline further. *Id.*, ¶¶ 46-50. The court's reading of the Amended Complaint seems to indicate that the stock price was $2.27 per share prior to the November 2022 announcement, and fell to $1.41 as of December 16, 2022, a total decline of approximately $0.86 per share or 37.8%. These subsequent declines appear to relate to the same accounting issues, however.

identified as an Accounting Manager who worked for Inspirato between 2019 and 2021, and who states that Mr. Handler "believed that he did not have to comply with [GAAP] and would "cut corners to get around GAAP" and "constantly sought ways to be 'creative' with the Company's accounting," instructing accountants to post journal entries "so they looked the way [Mr. Handler] wanted, not how GAAP required." *Id.*, ¶ 34. Confidential Witness 2 is identified as an IT Manager who worked at Inspirato from 2018 to 2023, and who states that as of 2020, Inspirato "had systems that the Company did not properly identify as part of its record-keeping process" and that "there were a lot of manual entries made [in Inspirato's financial reporting system] and no checks and balances on these processes." Confidential Witness 2 further stated that Mr. Neighbor was "extremely involved in meetings and issues that involved financial issues" during 2022, but that Inspirato's executives "did not prioritize the Company's internal controls, nor did they prioritize having sufficient qualified personnel to handle the Company's accounting issues." *Id.*, ¶¶ 40-42.

## LEGAL STANDARDS

Under Federal Rule of Civil Procedure 12(b)(6), defendants can move to dismiss for "failure to state a claim upon which relief can be granted." In deciding a motion under Rule 12(b)(6), the court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124-25 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)). Nevertheless, a plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation omitted). "Threadbare recitals of the elements of a cause of action,

4

supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (internal quotation marks omitted). That is, the complaint must include well-pleaded facts that, taken as true, "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

The *Twombly/Iqbal* pleading standard first requires the court to identify which allegations "are not entitled to the assumption of truth" because, for example, they state legal conclusions or merely recite the elements of a claim. *Id.* at 679. It next requires the court to assume the truth of the well-pleaded factual allegations "and then determine whether they plausibly give rise to an entitlement to relief." *Id.* In this analysis, courts "disregard conclusory statements and look only to whether the remaining factual allegations plausibly suggest the defendant is liable." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012). The ultimate duty of the court is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## ANALYSIS

I.      *Claim as Against Inspirato*

To adequately plead a claim for securities fraud under SEC Rule 10b-5, the Plaintiffs must allege facts showing: "(1) a material misrepresentation or omission by the defendant;

(2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) (quotation omitted). The Defendants' motion challenges the sufficiency of the Plaintiffs' allegations as to the scienter element.

To adequately plead the scienter requirement, the plaintiffs must adduce facts indicating that the defendants acted with "a mental state embracing intent to deceive, manipulate, or defraud." *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1109 (10th Cir. 2015) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 193 n.12 (1976)). The touchstone inquiry is whether the misrepresentations were "intentionally false or at least recklessly made." *Id.* at 1113. To be reckless, the defendants' conduct must be "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Put differently, "[n]egligence, even gross negligence, is not sufficient; something similar to 'conscious disregard' is required." *Id.* at 1113 (citation omitted).

The Private Securities Litigation Reform Act requires a complaint alleging securities fraud to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The requirement of a "strong" inference of scienter elevates the plaintiff's pleading burden for that element over the normal "plausibility" standard of Fed. R. Civ. P. 12(b)(6) and cases like *Iqbal*. To determine whether the "strong inference" requirement is satisfied, the court "must engage in a comparative evaluation; it must consider not only inferences urged by the plaintiff, [ ] but also competing inferences

rationally drawn from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). The inquiry is "inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?" *Id.* at 323. To qualify as "strong," the inference of scienter "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive [ ] only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

Like this case, *Gold Resource* involved claims of securities fraud arising from the defendants' restatement of earnings following its discovery of certain GAAP violations. The Tenth Circuit explained that "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim . . . . Only where such allegations are coupled with evidence that the violations or irregularities were the result of the defendant's fraudulent intent to mislead investors may they be sufficient to state a claim." *Gold*, 776 F.3d at 1113 (quoting *City of Phila. v. Fleming Cos., Inc.*, 264 F.3d 1245, 1261 (10th Cir. 2001)). *Gold Resource* illustrated this principle by contrasting the facts therein with those of *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083 (10th Cir. 2003). That distinction is useful here.

In *Adams*, the defendant corporation purchased an unprofitable natural gas plant. To conceal the resultant losses, the defendant, in violation of GAAP and its own internal accounting standards, accelerated revenues expected from the plant so as to create the appearance that the plant was profitable in the third quarter of 1997. *Id*. at 1089-90. The plaintiff in *Adams* alleged that the defendant was motivated to conceal the losses from the natural gas plant in mid-1997 because the defendant intended to issue additional shares in December 1997 and to facilitate a

planned merger with another entity in 1999. Both undertakings would have been adversely affected if the true unprofitability of the defendant's natural gas plant had been known in the third quarter of 1997. *Id.* at 1091. In finding that the plaintiffs' allegations of scienter were sufficient, the court acknowledged that GAAP violations alone cannot demonstrate scienter, but that "the alleged GAAP violations come on top of other particularized facts indicating that a key operation of the company was losing money, [the defendants] knew that fact, and [ ] falsely reported a profit for it." *Id.* at 1105-06. As to the defendants' knowledge, there were allegations that an Assistant Treasurer personally spoke with the Chief Financial Officer about how the financial projections of the natural gas plant were incorrect and that the plant was actually losing money, and had numerous, recurring meetings with the CFO about that issue prior to the CFO signing off on the misleading third quarter earnings report. *Id.* at 1088-89, 1104. Thus, the court in *Adams* found that the plaintiff had adequately alleged scienter.

   *Gold Resource* distinguished its facts from *Adams*. In *Gold Resource*, the plaintiff alleged that, among other things, the company improperly recognized revenue under a "provisional invoice" system, where customers would initially assay shipments of gold ore and predict what the payment for subsequent shipments would be. When the later shipments arrived, the customers would conduct a second assay and, if necessary, adjust the price payable under the invoices to conform to any discrepancies between the provisional invoices and the final shipments. The plaintiff contended that corporate executives were aware of significant discrepancies between the provisional invoices and the final shipments as of February 2012, such that relying on the provisional invoice system overstated what the company's eventual revenues would be, but the company continued to report earnings under that provisional invoice system

until November 2012. In November, the company announced that, due to a dispute with customers over discrepancies in its invoicing, the company would need to restate the earnings from the first two quarters of 2012, revising them significantly downward. 776 F.3d at 1106.

The court in *Gold Resource* found that the plaintiff's allegations did not sufficiently plead scienter. It noted that, unlike in *Adams*, the plaintiff had pointed to little more than GAAP violations alone and had not identified "other particularized facts indicating that a key operation of the company was losing money, [the defendant executives] knew that fact, and [they] falsely reported a profit for it." *Id*. at 1113. It noted that the record revealed "other plausible inferences [besides fraud] arising from the facts stated in the amended complaint," such as the fact that there was often a delay of several months before discrepancies would be noticed by the customer and relayed to officials of the defendant, and that "a prudent executive would want to [take additional time] to investigate and confirm a claimed discrepancy before disclosing it publicly." *Id.* at 1114-15. Thus, *Gold Resource* affirmed the district court's dismissal of the plaintiff's securities fraud claims.

Here, a fair reading of the Amended Complaint indicates that it falls closer to the *Gold Resource* example, alleging GAAP violations but not tying those violations to any broader scheme or more detailed assertions of knowledge that would permit a reasonable inference of the Defendants' scienter. For example, the plaintiff in *Adams* asserted facts showing <u>why</u> it was in the defendants' interest to artificially prop up the stock price: both a secondary offering and upcoming merger were dependent upon the stock's price remaining high, creating a powerful incentive for the defendants to falsely claim that the natural gas plant was profitable, rather than a loss. *See, e.g.*, *Smallen v. Western Union Co.*, 950 F.3d 1297, 1312 (10th Cir. 2020) ("Motive

can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference") (quoting *Tellabs*, 551 U.S. at 325). In *Indiana Public Retirement System v. Pluralsight, Inc.*, 45 F.4th 1236, 1263-67 (10th Cir. 2022), the court found that an inference of scienter was warranted where, among other things, corporate executives sold substantially more of the company's stock during the time when the alleged misrepresentations inflated its value than they did before or after that period. But here, the plaintiff does not identify any imminent business transactions, private trading by Inspirato's executives, or any other unusual circumstances that would suggest a motive for Inspirato's executives to perpetrate a fraud.

Nor do Plaintiffs assert the kinds of facts that *Adams* found to warrant an inference that the defendants knew the statements they were making were false. In *Adams*, a corporate official specifically sat down with one of the defendants on several occasions, advising him that the gas plant was not profitable. In such circumstances, when the defendant turned around and signed off on financial statements claiming the plant was profitable, it was reasonable to infer both the defendant's knowledge of the false statements and his intent to deceive investors. Here, Plaintiffs offer no direct evidence of any Inspirato official having actual (or even constructive) knowledge that the company's accounting for its leases violated ASC 842 and GAAP. Plaintiffs do not identify anyone who reported concerns about the accounting for the leases to any corporate official at the time, nor indicate any basis to conclude that the Defendants themselves harbored any concerns about the lease accounting. These facts, too, push this case closer to *Gold Resource* than they do to *Adams*.

Plaintiffs' response brief articulates several assertions that, they contend, demonstrate the necessary scienter: (1) the Confidential Witnesses' allegations demonstrate Mr. Handler and Mr.

Neighbor's extensive involvement with financial and accounting matters and their apparent disregard of basic accounting principles; (2) "the severity of the company's internal control problems"—namely Inspirato's admissions that it lacked staff with sufficient knowledge of GAAP and ASC 842 and that it lacked effective internal controls—supports a strong inference of scienter; and (3) Mr. Neighbor's departure, first as CFO in March 2022, and later from Inspirato entirely after the revelation of the accounting failures, likewise supports an inference of scienter. ECF No. 40 at 10-15.

The court summarily rejects the third item—the suggestion that Mr. Neighbor's resignation(s) from his position(s) with Inspirato contribute any weight to an inference of scienter. The amended complaint alleges that Mr. Neighbor resigned as Inspirato's CFO in March 2023, but stayed on as Chief Strategy Officer reporting directly to the CEO, and that Mr. Neighbor separated entirely from Inspirato in August 2023. ECF No. 31, ¶¶ 53, 56. There may be circumstances where an executive's resignation (or termination) following revelation of prior false statements can give support to an inference of scienter, but a plaintiff must offer "particularized allegations connecting the departures to the alleged fraud." *In Re Hertz Global Holdings, Inc.*, 905 F.3d 106, 118 (3d Cir. 2018) (quoted in *Meitav Dash Provident Funds & Pension, Ltd. v. Spirit AeroSystems Holdings, Inc.*, 79 F.4th 1209, 1228 (10th Cir. 2023)). As explained in *In re BISYS Securities Litigation*, 397 F. Supp. 2d. 430, 446 & nn.85, 87 (S.D.N.Y. 2005), "there are any number of reasons that an executive might resign, most of which are not related to fraud," and that the plaintiff bears the burden of pleading additional facts, beyond the mere fact of resignation, to illustrate a causal connection.

Plaintiffs here have not done so. They offer only the fact of Mr. Neighbor's resignations, standing alone, apparently believing that the timing alone is probative. The court agrees with the analysis in *Albert Fadem Trust v. American Elec. Power Co.*, *Inc.*, 334 F. Supp. 2d 985, 1014 (S.D. Ohio 2004), where the court found "no explanation for why [an executive's] resignation almost a month after the public disclosure should be viewed with unusual suspicion." *Compare Ho v. Duoyuan Global Water, Inc.*, 887 F. Supp. 2d 547, 575 (S.D.N.Y. 2012) (giving weight to CFO's resignation that occurred "approximately at the same time" that revelations of the company's fraud were occurring). The fact that Mr. Neighbor remained CFO for nearly six months after Inspirato announced it was restating its earnings, and remained an officer of the company for almost another six months thereafter, is not sufficiently close in time to Inspirato's restatements to warrant any inference of his scienter.

The remaining two items that Plaintiffs rely upon—evidence from two confidential witnesses about Inspirato's disregard of accounting formalities and a lack of adequate internal controls—essentially converge. At its heart, Plaintiffs' argument is that Inspirato in general, via Mr. Handler and Mr. Neighbor in particular, manifested a generalized and ongoing disregard of GAAP and known defects in accounting practices, and thus, it is reasonable to infer that their failure to ensure that the leases were properly accounted for pursuant to ASC 842 was, at the very least, reckless. Evidence from witnesses within the company that shed light on defendants' knowledge of financial irregularities and false statements can certainly help support an inference of scienter. For example, in *Adams*, the plaintiffs relied on evidence from an Assistant Treasurer who had personally discussed the natural gas plant's unprofitability with one of the defendants on several occasions. Given that the defendant was specifically discussing the plant's

unprofitability with the Treasurer, the court found it appropriate to infer scienter when that same defendant promptly turned around and signed financial statements falsely asserting that the plant was indeed profitable. *See* 340 F.3d at 1105. But to support the inference of scienter, the evidence from co-workers must be such that it reflects on the defendants' knowledge of the facts underlying the specific misrepresentations at issue.

Here, Plaintiffs' allegations concerning the two Confidential Witnesses do not speak directly to either Mr. Handler's or Mr. Neighbor's knowledge (or anyone else's) that Inspirato was misapplying GAAP and misrepresenting the revenue relating to the leases. The court begins its analysis with the allegations that Plaintiffs attribute to Confidential Witness 2 ("CW2"). CW2 is identified as an IT Manager who worked at Inspirato from 2018 until January 2023. Although the complaint refers to certain observations CW2 made in 2020, the court focuses on those assertions by CW2 that are germane to Inspirato's business practices in or about 2022. Specifically, CW2 states:

> (1) As of 2022, Mr. Neighbor "attended meetings involving the Company's financial department and was extremely involved in meetings and issues that involved financial issues." ECF No. 31, ¶ 41.

> (2) Mr. Handler "did not take the Company's internal control issues seriously." *Id.*

> (3) Inspirato's executives "did not prioritize the Company's internal controls, nor did they prioritize having sufficient qualified personnel to handle the Company's accounting issues." *Id.*

> (4) "The Company's finance team did not properly perform their work." The evidence CW2 tenders in support of this conclusion is that he "requested user access review information from the Company's finance department" at the beginning of 2022, but "did

not receive any of the requested information until near the end of the year." *Id.*, ¶ 42

(5) There were "several additional categories of internal controls issues that existed at Inspirato . . . including but not limited to user access/segregation of duties and financial reporting." *Id.* The amended complaint does not elaborate further on these or other issues or how they bear on Inspirato's errors regarding accounting for the leases.

Taken individually or as a whole, CW2's allegations offer little insight as to the scienter of Inspirato or its executives when it comes to the erroneous accounting of the leases and other financial misstatements at issue here. The items denoted as (4) and (5) above refer to issues that are unrelated to the errors in accounting for the leases. At most, these allegations are, simply, "Inspirato's finance team wasn't very good at accounting." Even if that characterization is true (and further assuming that CW2, as an IT Manager, is a competent witness to draw such a conclusion), those allegations simply indicate that Inspirato was negligent, perhaps even grossly so, in how its financial affairs were accounted for. But the plaintiffs' burden is to plead more than mere negligence. As *Gold Resource* makes clear, the requisite level of scienter is a degree of recklessness essentially amounting to "conscious disregard" of the likelihood that the company's financial reporting will be misleading.

The remaining allegations by CW2 add little more. The fact that Inspirato did not prioritize internal controls or hire capable accountants similarly does not suggest anything more than negligence. Moreover, Inspirato publicly acknowledged its defects in internal controls and difficulties in retaining qualified accountants as part of its disclosures in the 10-Q forms it filed in the first and second quarter of 2022. *See, e.g.*, ECF No. 31, ¶ 29 at 13-14 ("We have lacked a sufficient number of personnel with the appropriate level of knowledge and experience in the

application of GAAP, including the application of new accounting standards;" "We did not design and maintain effective controls relevant to the preparation of our financial statements"). After acknowledging those defects, Inspirato's 10-Q form states that the company believes it "made significant progress toward remediation of these control deficiencies described above," such that it now believed that its public filings were accurate and in compliance with GAAP. *Id.* CW2's allegations, which focus only on the existence of the accounting and internal control defects, do not comment on the remedial steps Inspirato claimed to be making, nor on the reasonableness of Inspirato's claimed belief that those remedial steps were effective. Finally, the mere fact that Mr. Neighbor participated in meetings regarding financial issues—he was, after all, the CFO—and the conclusory assertion that Mr. Handler did not take internal controls issues seriously do not meaningfully contribute evidence that either individual <u>knew of</u> the errors in Inspirato's accounting for the leases or, at the very least, <u>consciously disregarded</u> the likelihood that such errors were occurring. Simply put, Plaintiffs have not alleged facts that suggest anything more than negligence by Inspirato.

CW2's allegations are not materially aided by those of the other Confidential Witness, CW1. CW1 is identified as a Senior Accounting Manager at Inspirato from 2019 to October 2021.[3] CW1's allegations are as follows:

---

[3]    The court notes that CW1's tenure with Inspirato ended before the misstatements at issue here. To some extent, the court agrees with Plaintiffs that witnesses who are not employed by the company during the class period can nevertheless provide evidence indicative of scienter. *See In Re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017). *Quality Systems* explains that "statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Id.* (quotation omitted). There may be circumstances where a witness who was not present during the class period nevertheless has personal knowledge that, usually coupled with evidence from witnesses with

(1) Inspirato "built an internal technology without the assistance of anyone in finance or accounting," and that as a result, "the Company's accounting was materially incorrect for many years." ECF No. 31, ¶ 33.

(2) Mr. Handler "did not get along with anyone in leadership" in the accounting or finance departments. *Id.*

(3) Mr. Handler "believed he did not have to comply with [GAAP]" and would "cut corners to get around GAAP compliance." For example, Mr. Handler "made the Company's accountants post journal entries into the Company's financial statements so they looked the way he wanted, not how GAAP required." The accountants referred to these entries as "management financials." *Id.*, ¶ 34.

(4) CW1 gave the example of a revenue source that GAAP required to be recognized over the course of a year. Mr. Handler "demanded that the company recognize all the revenue immediately," even though GAAP did not allow such a practice.[4] *Id.*, ¶ 35.

---

contemporaneous knowledge, contributes to a showing of scienter. That was the case in *Quality Systems*, where witness CW6 was not personally employed by the company during the class period, but who nevertheless could offer personal knowledge about "executive-level management's real-time access to Salesforce reports forecasting quarterly sales." *Id.* That evidence corroborated that of witness CW5, who *was* employed during the class period, and who alleged that he or she "personally compiled sales reports using Salesforce [and] arranged for sales reports to be automatically delivered to . . . the CFO[]'s office." *Id.*

The court is not necessarily persuaded that CW1's allegations about pre-class period misconduct by the defendants is correlated with evidence of similar misconduct occurring during the class period; in other words, that CW1's allegations are similar to those of CW2. But the court need not make any particular findings on that point because CW1's allegations, even if treated as applying to the class period as well (and even coupled to those of CW2), nevertheless fail to raise a sufficient inference of scienter.

---

[4]     Although it is not strictly necessary to the court's reasoning and conclusions here, the court observes that the Amended Complaint appears somewhat cagey in the way it phrases

(5) The Company "did not have a history of valuing accounting personnel" and CW1 encountered technical issues in Inspirato's systems when attempting to implement a change in GAAP known as ASC 606. *Id.*, ¶ 36.

(6) Prior to 2020, Inspirato was accounting for a company-created currency called "travel perks" in a way that CW1 considered "fraud." Possibly in conjunction with an audit in 2020, Inspirato "attempted to fix the issue," but was hampered by the fact that "the Company was not willing to hire people with adequate accounting or finance knowledge" and that it "did not have appropriate safeguards for internal controls and processes." CW1 specifically opines that Inspirato's executives "did not even know the purpose of such controls." *Id.*, ¶ 37.

---

CW1's allegations about Mr. Handler's actions. It alleges, for example, that Mr. Handler "demanded that the Company recognize all revenue immediately" from a certain transaction, rather than incrementally as GAAP required. ECF No. 31, ¶ 35. But the Amended Complaint does not allege that the accounting staff ultimately capitulated to Mr. Handler's demand, or even that anyone ever explained to Mr. Handler that GAAP provided only one method to account for the transaction. The Amended Complaint also alleges that Mr. Handler "made the Company's accountants post journal entries into the Company's financial statements so they looked the way he wanted, not how GAAP required," but also acknowledges that the accounting staff was aware of this practice and apparently referred to those entries disparagingly as "management financials." *Id.*, ¶ 34. The Amended Complaint does not allege that Inspirato's accountants ultimately incorporated these improper "management financials" into Inspirato's actual financial statements.

It is not uncommon for corporate executives to lack a full appreciation of complex fields such as accounting and to make demands that would seem impossible or illegal to experts in that field. In some organizations, it may be that the experts comply with that demand and falsify records. But it may also be that those experts might avoid conflict by silently allowing the executive to believe that his or her demands have been met when, in fact, the experts have ignored the demand and ensured that the company's official records remain correct. Plaintiffs here want the court to assume that the former is the case, but the latter is equally probable, and the Amended Complaint does not provide any additional insight as to the situation at Inspirato.

> (7) The accounting staff that Inspirato had "did not have the background and experience to properly perform the work" necessary to implement ASC 842. *Id.*, ¶ 38.

Giving CW1's assertions the maximum possible credit, the court nevertheless finds that they fail to support a strong inference of scienter as it relates to Inspirato's misstatements in its first and second quarter financials in 2022. The only allegation by CW1 that even possibly bears directly on the errors in accounting for the leases is the item listed as (7), indicating that Inspirato's accounting staff lacked the knowledge to properly implement ASC 842, leading to the misstatements. But CW1 sheds no light on the degree to which Inspirato was aware at the time of its accountants' deficiencies or the degree to which those deficiencies were resulting in misleading financial statements. As noted above, Inspirato's 10-Q filings in both the first and second quarter of 2022 expressly acknowledged that Inspirato had struggled in the <u>past</u> with its accountants' knowledge and its defective internal controls, but indicated that it believed it had since overcome those problems. Nothing in CW1's allegations about prior accounting issues (*e.g.*, items (1), (5), and (6) above) shed light on whether Inspirato's belief that it had cured those problems by 2022 was unreasonable, much less as to whether Inspirato was merely negligent in believing so or whether it was intentionally misrepresenting that belief or consciously disregarding the likelihood that that belief was mistaken.[5]

---

[5] Indeed, CW1's statement in item (6) that Inspirato's executives "did not even know the purpose of" certain internal controls would seem to suggest nothing more than the executives' negligence in their oversight of the accounting department. CW1's allegations cannot rise to the level of suggesting the executives' "conscious disregard" of the likelihood that their deficient internal controls would lead to misstatements if, as CW1 appears to suggest, the executives didn't even know why the internal controls were required in the first place.

That leaves CW1's allegations about Mr. Handler in particular. In essence, CW1 reports that, at some unknown point in time and in relation to some unknown issue, Mr. Handler demanded that the accounting department engage in the accounting practices that Mr. Handler wanted, whether or not they complied with GAAP. Assuming this to be true, it does not particularly shed light on the question of whether Mr. Handler engaged in that same behavior with regard to the accounting for the leases in violation of ASC 842. Taken to their logical end, CW1's allegations offer two competing theories as to why Inspirato incorrectly accounted for the leases and violated GAAP in the first and second quarters of 2022. It may be that, consistent with his past practice, Mr. Handler directed the accounting department to account for the leases more favorably for Inspirato, over the accounting department's objection that doing so would violate GAAP. Or it may be that, consistent with CW1's allegations about incompetence within the accounting department itself, Inspirato's accountants simply lacked sufficient knowledge about implementing ASC 842 to account for the leases correctly (and that Mr. Handler had no involvement in the issue). The former might support a claim for securities fraud, whereas the latter reflects nothing more than negligence. But nothing in CW1's allegations, even taken in conjunction with the remaining allegations in the complaint, give the court any reason to choose the former explanation over the latter. Indeed, the predominant thrust of the Amended Complaint is that accounting errors (likely resulting from a neglected, possibly adversarial accounting department), not purposeful fraud, was the reason for the misstated financials in 2022. As set forth above, to create a "strong inference of scienter," the plaintiffs' facts suggesting fraudulent intent or recklessness must be "at least as compelling as any opposing inference one could draw from the facts alleged." Plaintiffs have failed to meet that standard.

Even analyzing the allegations through the lesser standard of recklessness does not save Plaintiffs' claims. We may take as a given the suggestion that Inspirato's accounting department was incapable of properly implementing ASC 842 as it related to the leases. We can accept the suggestion that Inspirato historically failed to "value" the accounting department and thus did not devote attention and resources to staff that department effectively and implement appropriate internal controls. We can accept the proposition that Inspirato had discovered problems in its accounting department and internal controls in an audit in or about 2020. But those allegations do not suffice to demonstrate the Defendants' recklessness—their "conscious disregard"—towards the likelihood that the 2022 filings would be misleading. Plaintiffs must show that the risk of such misstatements was "known to the defendant[s] or is so obvious that the [defendants] must have been aware of it." *Indiana Pub. Ret. Sys.*, 45 F.4th at 1259. Perhaps one could say that Inspirato's past problems with accounting and internal controls put Defendants on notice that a failure to correct course might result in future misstatements, thus constituting recklessness towards the prospect of future financial misstatements. But any inference of recklessness on the facts herein is dispelled by the representation in Inspirato's 2022 10-Q filings. Those filings stated that Inspirato was aware of past problems with accounting and internal controls and that it believed it had cured them, such that the 2022 financial statements were consistent with GAAP. Nothing in the Amended Complaint offers any reason as to why that assertion should be disbelieved. Plaintiffs do not allege, for example, that the statements in the 10-Q were false and that Inspirato had done nothing to address the prior defects, or that Inspirato had reason to know that the remedial steps it had taken were not effective. In the absence of such allegations, Plaintiffs have failed to raise an inference of scienter amounting to recklessness.

Accordingly, the court finds that Plaintiffs have failed to adequately plead the necessary element of scienter. Thus, the court respectfully **RECOMMENDS** that Defendants' motion to dismiss the securities fraud claims be **granted**.

II.      *"Control Person" Liability Against the Individual Defendants*

Plaintiffs assert "control person" liability claims against Mr. Handler and Mr. Neighbor, seeking to hold them individually liable for acts of securities fraud committed by Inspirato. In the absence of a colorable claim of direct liability for securities fraud, claims for "control person" liability against the individual directors and officers of an entity cannot exist. *Meitav Dash*, 79 F.4th at 1230. Because the court recommends that Plaintiffs' claims against Inspirato be dismissed, the court further **RECOMMENDS** that Defendants' motion to dismiss the "control person" claims against Mr. Handler and Mr. Neighbor be **granted**.

## CONCLUSION

For the foregoing reasons, the court **RECOMMENDS** that Defendants' Motion to Dismiss, ECF No. 33, be **granted**.[6] Plaintiffs have not indicated whether they believe that they could cure the defects identified herein if given an opportunity to amend their complaint pursuant

---

[6] Rule 72 of the Federal Rules of Civil Procedure provides that within fourteen (14) days after service of a Magistrate Judge's order or recommendation, any party may serve and file written objections with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. §§ 636(b)(1)(A), (B); Fed. R. Civ. P. 72(a), (b). Failure to make any such objection will result in a waiver of the right to appeal the Magistrate Judge's order or recommendation. *See Sinclair Wyo. Ref. Co. v. A & B Builders, Ltd.*, 989 F.3d 747, 782 (10th Cir. 2021) (firm waiver rule applies to non-dispositive orders); *but see Morales-Fernandez v. INS*, 418 F.3d 1116, 1119, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review, including when a "pro se litigant has not been informed of the time period for objecting and the consequences of failing to object").

to Fed. R. Civ. P. 15(a), and therefore, the court makes no recommendation as to whether such leave should be granted.

DATED: July 16, 2024                              BY THE COURT:

_____
Susan Prose
United States Magistrate Judge