**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

| | |
|---|---|
| ILAN BOUZAGLO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>INSPIRATO INCORPORATED, BRENT HANDLER, AND R. WESTER NEIGHBOR,<br><br>Defendants. | Civil Action No. 1:23-cv-00438-RMR-SBP<br><br>JURY TRIAL DEMANDED<br><br><u>CLASS ACTION</u> |

---

**PLAINTIFF'S UNOPPOSED RENEWED MOTION FOR LEAVE TO FILE PROPOSED
SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

---

Pursuant to Rule 15 of the Federal Rules of Civil Procedure, D.C.COLO.L.CivR 15, and the Court's prior Order (ECF No. 56), Lead Plaintiff Ilan Bouzaglo ("Plaintiff") hereby submits this unopposed renewed motion for leave to amend to file Plaintiff's Proposed Second Amended Complaint for Violations of the Federal Securities Laws ("Proposed SAC"). Pursuant to D.C.COLO.L.CivR 15(b) and the Court's prior Order (ECF No. 56): (1) a redlined version of the Proposed SAC that strikes through the text to be deleted and underlines the text to be added is attached as Exhibit A; and (2) a clean version of the Proposed SAC is attached as Exhibit B.[1]

## I.      LEGAL STANDARDS

Leave to amend is "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). "Refusing leave to amend is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993); *Cottonwood Acres, LLC. v. First Am. Title Ins. Co.*, No. 2:22-CV-00680-TC-DBP, 2023 WL 4548076, at *1 (D. Utah July 14, 2023). Moreover, the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which applies to claims here under the Securities Exchange Act of 1934 ("Exchange Act"), does not affect Rule 15's liberal application.

---

[1]      Defendants are Inspirato Incorporated ("Inspirato" or the "Company"), Chief Executive Officer ("CEO") Brent Handler ("Handler"), and Chief Financial Officer ("CFO") R. Webster Neighbor ("Neighbor") (collectively "Defendants"). Pursuant to D.C.COLO.LCivR7.1(a), counsel for Plaintiff held a meet-and-confer discussion with counsel for Defendants on November 1, 2024 regarding this motion. During the meet-and-confer discussion, counsel for Defendants indicated that Defendants do not oppose this motion, but they reserve the right to move to dismiss the Proposed SAC. Plaintiff's renewed motion is substantively similar to Plaintiff's original motion. Unless indicated otherwise, all internal citations and quotations are omitted.

## II.    AMENDMENT WOULD NOT BE FUTILE

To state a claim under the Exchange Act, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014).

On September 23, 2024, the Court issued an Order adopting the Recommendation of United States Magistrate Judge Prose ("Recommendation") with respect to Defendants' prior motion to dismiss.  ECF No. 52.  The Recommendation held that Plaintiff had not sufficiently alleged the element of scienter in the prior complaint.  ECF No. 52.  For Exchange Act claims, scienter is "a mental state embracing intent to deceive, manipulate, or defraud, or recklessness."  *Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1258-69 (10th Cir. 2022); ECF No. 52 at 6.  Plaintiff has adequately alleged scienter in the Proposed SAC.

For instance, Plaintiff alleges that while in possession of material, non-public information, CEO Handler sold 89,345 shares of the Company's stock for proceeds of $317,847.57, while the price of the Company's stock was artificially inflated.  ¶¶45-47.[2] Plaintiff also alleges that the accounts of Confidential Witnesses ("CWs") also demonstrate that Defendants acted with scienter when they made their false and misleading statements.  ¶¶48-71.  For instance, CW5 (who worked at Inspirato from August 2020 to September 2023 in various capacities, including GL Accountant, Property Accountant, and Senior Property Accountant, and who specifically worked on issues

---

[2]    All paragraph ("¶") references are to Plaintiff's Proposed SAC.

related to the Company's implementation of Accounting Standards Codification ("ASC") 842) said that an Enterprise Resource Planning ("ERP") system was supposed to calculate the Company's lease accounting in accordance with ASC 842. ¶¶64, 67. However, CW5 stated that Defendants never properly set up the system. ¶67. CW5 said that once the ERP system was initiated, it malfunctioned and wreaked havoc on Inspirato's software system. *Id.* As a result, CW5 stated that the Company's lease accounting had to be performed manually and that the Company was failing to book deferred rent because of this manual process. ¶¶67-68.

CW5 also had multiple telephone calls with CFO Neighbor in which CW5 stated to Neighbor that the Company lacked internal controls, review processes, and managers. ¶70. CW5 also informed CFO Neighbor during these telephone calls that the accounting personnel would perform a month-end close and book journal entries and no one ever looked at them. *Id.* According to CW5 – and as CW1 indicated – the accounting personnel could have posted whatever numbers they wanted and no one would ever know if they were right or wrong. ¶¶52, 70. CW5 also stated that CW5 sent a very lengthy email in the beginning of 2021 expressing these concerns to CFO Neighbor. ¶70. CW5 stated that CFO Neighbor claimed he would look into fixing the issues. *Id*.

CW5 also had conversations with CFO Neighbor regarding the misapplication of ASC 842, including at the time CW5 started at the Company. ¶71. CW5 stated that it was a nightmare that landed on CW5's plate, and that, as a result, CW5 was very open about the issue and would speak to anyone who would listen. *Id*. CW5 also recalls that in the fall of 2022, the Company held a large meeting with all managers, account executives, and everyone involved in lease accounting during which this issue was

3

discussed.  *Id*.  CW5 stated that the participants acknowledged that the issue with lease accounting was a "big issue, and it's wrong."  CW5 stated that CFO Neighbor was a participant during this meeting.  *Id*.

Other facts alleged further demonstrate that Plaintiff has adequately alleged scienter, including: (1) Defendants' access to information and the hands-on management style of CEO Handler and CFO Neighbor (¶72); (2) the core operations inference (¶¶73-75); (3) the remedial actions taken by the Company (¶¶76-77); (4) the simplicity of the accounting standards (¶78); and (5) CFO Neighbor's undisclosed termination.  ¶¶79-82.  Considering these facts collectively as required (*Pluralsight*, 45 F.4th at 1267-68), the Proposed SAC adequately alleges scienter.

### III.    Amendment Is Not Prejudicial or Otherwise Unjustified

The Proposed SAC represents the second amended pleading in this case and this renewed motion accepts the Court's invitation to apply for leave to file the Proposed SAC. In the context of this complex securities litigation, two amendments in no way prejudices Defendants, who are presented with a more cogent theory of liability in the Proposed SAC.  Nor is there any basis on which to conclude that this renewed motion is the product of bad faith.

### IV.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant this unopposed motion for leave to file the Proposed SAC.

Dated:  November 5, 2024

GLANCY PRONGAY & MURRAY LLP

By:  */s/ Ex Kano S. Sams II*
Robert V. Prongay
Ex Kano S. Sams II
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
rprongay@glancylaw.com
esams@glancylaw.com
clinehan@glancylaw.com

*Attorneys for Lead Plaintiff Ilan Bouzaglo*

THE  LAW  OFFICES  OF  FRANK  R. CRUZ
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

*Additional Counsel for Lead Plaintiff*

5

## <u>PROOF OF SERVICE</u>

I hereby certify that on this 5th day of November, 2024, a true and correct copy of

the foregoing document was served by CM/ECF to the parties registered to the Court's

CM/ECF system.

*s/ Ex Kano S. Sams II*
Ex Kano S. Sams II

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

| | |
|---|---|
| ~~KEITH KOCH~~ILAN BOUZAGLO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>INSPIRATO INCORPORATED, BRENT HANDLER, AND R. WESTER NEIGHBOR,<br><br>Defendants. | Civil Action No. 1:23-cv-00438-RMR-~~MEH~~SBP<br><br><br>~~AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS~~<br><br><br>JURY TRIAL DEMANDED<br><br>CLASS ACTION |

**[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**TABLE OF CONTENTS**

NATURE OF THE ACTION ........................................................................................................ 1

JURISDICTION AND VENUE ................................................................................................... 1

PARTIES ..................................................................................................................................... 2

SUBSTANTIVE ALLEGATIONS ............................................................................................. 4

    Background ........................................................................................................................... 4

    False and Misleading Statements ....................................................................................... 9

    The Truth Begins to Emerge ............................................................................................. 23

POST CLASS PERIOD EVENTS ............................................................................................ 31

CLASS ACTION ALLEGATIONS .......................................................................................... 32

LOSS CAUSATION .................................................................................................................. 34

APPLICABILITY OF PRESUMPTION OF RELIANCE: ...................................................... 35

FRAUD ON THE MARKET DOCTRINE ............................................................................... 35

NO SAFE HARBOR ................................................................................................................. 36

COUNT I ................................................................................................................................... 37

COUNT II .................................................................................................................................. 38

PRAYER FOR RELIEF ............................................................................................................ 39

JURY DEMAND ....................................................................................................................... 39

i

NATURE OF THE ACTION .......................................................................................... 1

JURISDICTION AND VENUE ..................................................................................... 3

PARTIES ................................................................................................................... 3

SUBSTANTIVE ALLEGATIONS ................................................................................ 7

DEFENDANTS' FALSE AND MISLEADING STATEMENTS....................................... 14

DEFENDANTS ACTED WITH SCIENTER ................................................................. 26

THE TRUTH BEGINS TO EMERGE .......................................................................... 39

CLASS ACTION ALLEGATIONS ............................................................................... 49

LOSS CAUSATION ................................................................................................... 51

APPLICABILITY OF PRESUMPTION OF RELIANCE:................................................ 52

FRAUD ON THE MARKET DOCTRINE ..................................................................... 52

NO SAFE HARBOR .................................................................................................. 53

PRAYER FOR RELIEF.............................................................................................. 56

JURY DEMAND......................................................................................................... 57

Lead Plaintiff ~~Llan~~Ilan Bouzaglo ("Plaintiff") alleges the following based upon the investigation of Plaintiff's counsel~~, which~~. This investigation included, among other things, a review of: (1) United States Securities and Exchange Commission ("SEC") filings by Inspirato Incorporated ("Inspirato" or the "Company~~"), as well as securities~~"); (2) the accounts of former employees of the Company; (3) analysts' reports and advisories about the Company~~,~~; and (4) press releases, media reports, and other public statements issued by, or about, the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action brought on behalf of all persons and/or entities who purchased ~~or acquired~~ the Company's securities between May 11, 2022, and December 15, 2022, inclusive ~~(the "~~("Class Period~~"), seeking~~"). Plaintiff seeks to pursue remedies under the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2. Inspirato is a travel subscription company. In February 2022, the private travel club closed its business combination with a Special Purpose Acquisition Company ("SPAC") and began trading on the NASDAQ stock market.

3. On December 15, 2022, however, Inspirato was forced to restate its financial statements due to the misapplication of the applicable standard for lease accounting. As alleged herein, this restatement was not an innocent mistake. Rather, Defendants knowingly and/or recklessly disregarded the risks associated with the

Company's lease accounting and the falsity of Inspirato's statements regarding the Company's lease accounting.

4.    For instance, one former Company accountant indicated that the Company's software system was supposed to calculate the Company's lease accounting in accordance with the applicable standard.  Defendants, however, never properly set up the system.  As a result, the system malfunctioned and wreaked havoc on Inspirato's software system, and the Company's lease accounting had to be performed manually.  Among other things, this manual process led to the Company's failure to properly book deferred rent.

5.    Additionally, former company employees had multiple conversations with (and sent lengthy emails to) the Company's executives regarding these issues.  The former employees also describe meetings in which Defendants characterized Inspirato's lease accounting as a "big issue, and it's wrong."

6.    Significantly, Inspirato's Chief Executive Officer ("CEO") profited handsomely by selling a significant amount of Inspirato stock while the price of the Company's stock was artificially inflated.  Conversely, the Company's investors were unaware of what Inspirato's insiders knew, and they suffered significant losses when the truth was finally revealed.  As a result, Plaintiff brings this action on his own behalf and on behalf of a class of investors for the violations of the federal securities laws alleged herein.

2

## JURISDICTION AND VENUE

2.7.    The claims asserted herein arise under, and pursuant to, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

3.8.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

4.9.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).    Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred, in substantial part, in this District.

5.10.  In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of an electronic securities exchange located inwithin this District.

## PARTIES

6.11.  As set forth in the previously filed certification which is incorporated by reference herein, Plaintiff purchased the Company's securities during the Class Period and has been damaged thereby.

7.12.  Defendant Inspirato purports to be a subscription-based luxury travel company that providespurports to provide unique solutions for: (i) affluent travelers seeking superior service and certainty across a wide variety of accommodations and experiences; and (ii) hospitality suppliers who want to solve pain points that include monetizing excess inventory and efficiently outsourcing the hassle involved in managing

3

rental properties. Inspirato is headquartered at 1544 Wazee Street, Denver, CO 80202 and incorporated in Delaware.  Inspirato shares are listed on NASDAQ under ticker symbol ISPO.

8. Defendant Brent Handler ("Handler") is and was at all pertinent times the Company's Chief Executive Officer ("CEO") and Director.

9. Defendant R. Webster Neighbor ("Neighbor") is and was at all pertinent times the Company's Chief Financial Officer ("CFO").

13. Defendant Brent Handler ("Handler") was at all relevant times the Company's CEO and Director.  CEO Handler co-founded Inspirato with his brother Brad Handler.  CEO Handler has served as CEO and on the Company's Board of Directors since February 2022.  CEO Handler has also served as the CEO of Inspirato LLC and as a member of its Board of Managers since January 2010.  Before co-founding Inspirato, CEO Handler co-founded Exclusive Resorts and served as its President from 2002 to 2009.  CEO Handler holds a Bachelor of Science degree in Business from the University of Colorado, Boulder.

14. Defendant R. Webster Neighbor ("Neighbor") was at all relevant times the Company's Chief Financial Officer ("CFO").  CFO Neighbor began serving as CFO of the Company in February 2022, and previously served as the CFO of Inspirato LLC beginning in November 2020.  Before joining Inspirato, CFO Neighbor was a private investor and independent consultant from April 2016 through November 2020.  CFO Neighbor has also served as Executive Vice President of Strategic Initiatives of the Irvine Company, a real estate development and investment company, from 2013 to March 2016, and as CFO and Treasurer of Archstone, a Real Estate Investment Trust, from 2012 to 2013.  CFO Neighbor also served as a Senior Vice President at Lehman Brothers. CFO Neighbor holds a Bachelor of Science degree in Civil Engineering from Oregon State University

4

and a Master of Business Administration from the University of North Carolina Kenan-Flagler Business School.  CFO Neighbor was second only to CEO Handler in the management of Inspirato's financial affairs.

10.15. Defendants Inspirato, Handler, and Neighbor are collectively referred to herein as "Defendants."  Defendants Handler and Neighbor are collectively referred to herein as the "Individual Defendants."

11.16. During the Class Period, the Individual Defendants, as senior executive officers and/or directors of the Company, were privy to confidential and proprietary information concerning the Company, its operations, finances, financial condition, and present and future business prospects.  Additionally, as set forth more fully below, the Individual Defendants had access to material adverse non-public information concerning the Company.  Because of their positions within the Company, the Individual Defendants had access to non-public information about the Company's business, finances, products, markets, and present and future business prospects via internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew, or were deliberately reckless in not knowing, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

12.17. The Individual Defendants are liable as direct participants in the wrongs alleged herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of

5

Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct alleged.  Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of the Company's business.

13.18. The Individual Defendants, because of their positions within the Company, controlled and/or possessed the authority to control the contents of the Company's reports, press releases, and presentations to securities analysts and, through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged to be misleading herein, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

14.19. The Individual Defendants, as senior executive officers and/or directors – and as controlling persons of a publicly-traded company whose common stock was, and is, governed by the federal securities laws – had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's securities would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissionshalf-truths during the Class Period violated these specific requirements and obligations.

15.20. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud and/or deceit on purchasers of the Company's securities by disseminating materially false and misleading statements and/or concealing material adverse facts.  This scheme: (1) deceived the investing public regarding the Company's business, operations and management, and the intrinsic value of the Company's securities; (2) enabled the Company to obtain additional capital at favorable prices, create a public market for its securities, and gain access to the public equity markets; and (3) caused Plaintiff and members of the Class to purchase the Company's securities at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### Background

16.21. Inspirato is a small company.  It was incorporated in Delaware on July 31, 2020, as Thayer Ventures Acquisition Corporation ("Thayer"), a special purpose acquisition company formed for the purpose of effecting a merger with one or more operating businesses.  On June 30, 2021, Inspirato LLC entered into a business combination agreement dated June 30, 2021 (as amended September 15, 2021) to become a publicly traded company through a business combination with Thayer.  On February 11, 2022, Thayer and Inspirato LLC consummated the transaction contemplated in the business combination agreement whereby amongst other transactions, a subsidiary of Thayer merged within and into Inspirato LLC with Inspirato LLC as the surviving company, resulting in Inspirato LLC becoming a subsidiary of Thayer.  Thayer changed its name to "Inspirato Incorporated" upon closing of the business combination.  As of June 30, 2022, the Company had only 368 operations employees.

7

17.22. Inspirato is a travel subscription company that claims to provide unique solutions for: (1) affluent travelers seeking superior service and certainty across a wide variety of accommodations and experiences; and (2) hospitality suppliers who want to solve pain points that include monetizing excess inventory and efficiently outsourcing the hassle involved in managing rental properties.

18.23. For travelers, The Company claimed to offer travelers access to a diverse portfolio of curated luxury vacation options that, as of December 31, 2022, included 523 private luxury vacation homes available to the Company's subscribers, and accommodations at 350 luxury hotel and resort partners in more than 225 destinations around the world.  Inspirato also claimed that its portfolio also included: (1) Inspirato Only, featuring one-of-a-kind luxury safaris, cruises, and other experiences,; and (2) Bespoke, which offered custom-designed "bucket list" itineraries.  The Company touted that every Inspirato trip came with its personalized service envelope — including pre-trip planning, on-site concierge, and daily housekeeping — designed to meet the needs of affluent travelers.

19.24. The Company's portfolio of luxury vacation options was accessed through its subscription platform.  The Company offered three subscriptions: (1) Inspirato Club; (2) Inspirato Pass; and (3) Inspirato Select.

20.25. Launched in 2011, Inspirato Club subscribers paid an enrollment fee and monthly or annual subscription for access to the Company's portfolio of branded Inspirato luxury vacation homes, luxury hotels, and five-star resort partners, Inspirato Only experiences, and custom Bespoke itineraries.  In addition to their monthly or annual subscription, subscribers paid members-only nightly rates to book the trips of their choice.

8

Inspirato Club subscribers could book vacations up to one year in advance. Inspirato claimed that every Club trip included first-class, personalized service from a team of hospitality experts, including pre-trip planning, on-site concierge, and daily housekeeping. The Company Inspirato claimed that it the Company revenue-managed these rates to achieve occupancy and average daily rate goals while also delivering value to drive subscriber satisfaction.

21. 26. Launched in 2019, Inspirato Pass subscribers paid an enrollment fee and a monthly or annual subscription that was inclusive of nightly rates, taxes, and fees for Pass trips. Inspirato Pass subscribers booked Pass trips from the Inspirato Pass trip list, which was a constantly updated selection that, as of December 31, 2022, was comprised of more than 2.1 million vacations, ranging from Inspirato residences and hotel partners to custom experiences such as luxury cruises and safaris. The Company represented that Inspirato Pass subscribers had full access to all the benefits of Inspirato Club, including the ability to pay members-only nightly rates to book trips of their choice, access to the Company's booking promotions, and personalized service on every trip.

22. 27. Launched in 2022, Inspirato Select subscribers paid an enrollment fee and annual subscription. The Company claimed that Inspirato Select's hallmark benefit was the ability to book and share Inspirato Select Trips at no additional cost. Subscribers chose from more than 555,000 trip options, including branded Inspirato luxury vacation homes, luxury hotels, and five-star resorts. The initial subscription came with three Inspirato Select Trips, and subscribers could then purchase packages of additional trips whenever they chose to do so. The Company also touted that Inspirato Select provided all the benefits of Inspirato Club, including access to book a la carte travel within

9

Inspirato's exclusive portfolio at members-only nightly rates with five-star personalized service on every trip.  The Company further claimed that Inspirato Select Trips were 100% transferrable and could be shared with others at no additional cost.

23.28. The Company represented that all three subscriptions offered travelers: (1) the ability to book trips of their choice within its luxury vacation portfolio up to one year in advance; (2) the purported full Inspirato service experience; and (3) access to Inspirato benefits, such as member events, luxury travel agent services, and partner benefits.  The Company stated that Inspirato Pass subscribers enjoyed the additional benefit of being able to book trips from the Inspirato Pass trip list, which was a constantly updated selection that, as of December 31, 2022, was comprised of approximately 2.1 million vacations.  Additionally, the Company represented that Inspirato Select subscribers were able to book a set number of trips each year from the Inspirato Select trip list, which was a constantly updated selection that, as of December 31, 2022, was comprised of more than 555,000 vacations.

24.29. Inspirato also claimed to solve critical pain points for hospitality suppliers, including luxury vacation homeowners seeking to monetize their property with rental income.  For example, because Inspirato Pass did not show nightly rates, the Company touted that it provided an opaque distribution channel through which luxury hotels, resorts, and vacation homeowners could generate revenue from their excess inventory — unoccupied hotel rooms or vacation rentals — without undercutting rates on their own website and other brand assets.  The Company represented that it had arrangements with hotels and resort partners to lease rooms under long-term agreements, providing them with fixed income for excess inventory versus uncertain occupancy-based income.

10

Inspirato also claimed that it provided luxury vacation homeowners with a simplified, hassle-free ownership experience by providing a fixed monthly lease payment, expert property management services, and flexible usage benefits in exchange for leasing their home for inclusion within the Company's portfolio.

25.30. In 2021, the Company also launched Inspirato Real Estate as a new consumer-facing brand. The Company claimed that Inspirato Real Estate offered an easy way to find, buy, own, and enjoy a luxury vacation home. Inspirato claimed that prospective buyers could explore a vetted collection of properties in dozens of top vacation destinations directly on the Inspirato Real Estate website. Inspirato represented that once theyprospective buyers decided where to buy, Inspirato Real Estate's expert team assisted them every step of the way as they selected the perfect vacation home, including connecting them to a local real estate professional. The Company claimed that prior to closing, theycustomers received a personalized lease overview and financial return profile including a net income projection for their chosen property. Inspirato also touted that at closing, they leased their new home to Inspirato and enjoyed benefits specifically designed to remove the worry and uncertainty of luxury vacation home ownership.

26.31. In the third quarter 2022, the Company developed two new product offerings: Inspirato for Good and Inspirato for Business. The Company claimed that Inspirato for Good was its turnkey solution for nonprofit fundraising. Through this platform, the Company represented that it partnered with nonprofit organizations to offer luxury travel packages (consisting of an Inspirato subscription and luxury vacation) at live and silent auctions, paddle raises, and other giving channels. Additionally, the Company

11

claimed that Inspirato for Business represented a business-to-business channel whereby the Company provided subscription and travel products directly to businesses seeking to provide luxury accommodations and services to their staff and business partners.

27.32. The Company represented that since its founding, it developed a highly flexible, asset-light approach to controlling and managing its residences.   Inspirato claimed that the central tenet of this approach is that it leased its homes, paying the owners fixed rental income, rather than buying them.  The Company stated that its leases typically permitted it to terminate within one years' notice, giving Inspirato the ability to remove underperforming residences as well as curate the portfolio generally in response to market opportunities and travel demand trends.  Inspirato also represented that many of its leases also had a "force majeure" clause in anticipation of impossible-to-predict disruptive market events, and that during the COVID-19 pandemic, it was able to collaborate with its landlord partners regarding these clauses to purportedly reduce operating costs.  Furthermore, the Company claimed that in addition to traditional leases, it also used other flexible arrangements to secure less than approximately 10% of its residences, including net rate and profit-sharing agreements whereby it paid the property owner based on occupancy and costs instead of fixed monthly payments.

### ASC 842 Lease Accounting Requirements

33.    ASC 842, or Accounting Standards Codification 842, is an accounting standard under Generally Accepted Accounting Principles ("GAAP").  The standard was issued by the Financial Accounting Standards Board ("FASB"), and it impacts lease accounting and reporting.  In February 2016, the FASB issued ASC 842 to require lessees to recognize all leases, with certain exceptions, on the balance sheet.  Subsequently, the

12

FASB issued ASU No. 2018-10, Codification Improvements to Topic 842, Leases, ASU No. 2018-11, Targeted Improvements, ASU No. 2018-20, Narrow-Scope Improvements for Lessors, and ASU 2019-01, Codification Improvements, to clarify and amend the guidance in ASU No. 2016-02. ASC 842 eliminates real estate-specific provisions and modifies certain aspects of lessor accounting. The standard requires that lessees recognize right-of-use assets and lease liabilities on the balance sheet for most leases. This requirement brings greater transparency related to the financial leverage and capital employed by companies.

34.     ASC 842 can be simple to understand, interpret, and apply, particularly for accounting professionals. ASC 842 requires that lessees recognize assets and liabilities on the balance sheet for all leases with terms longer than 12 months. ASC 842 also eliminates the classification of leases as either operating leases or finance leases for lessees. Instead, lessees must recognize a right-of-use asset and a lease liability for virtually all lease contracts. By recognizing essentially all leases on the balance sheet, the standard is intended to provide investors a more accurate picture of a company's leasing activities and obligations. Moreover, because ASC 842 became effective for public companies before it became effective for private companies (like Inspirato at the time), many of the idiosyncrasies of the implementation of the standard became known to accounting professionals at private companies and were manageable.

**Inspirato's Lease Agreements**

35.     Inspirato is a party to operating lease agreements for its vacation homes, hotels, and corporate offices. The Company entered into operating leases primarily for standalone homes, luxury condos, and hotel rooms. Defendants determined whether an

13

arrangement is a lease, or contains a lease, including embedded leases, at inception and recorded the leases in the Company's financial statements.  Leases had initial terms of up to 10 years and generally contained extension options at the approval of both parties.

36.    Inspirato claims to have adopted ASC 842 as of January 1, 2022. Additionally, Defendants claim that Inspirato's adoption of the new lease standard on January 1, 2022 had a material impact on the Company's interim condensed consolidated financial statements, and that the most significant impacts related to: (1) the recording of Right of Use ("ROU") assets of $193 million; and (2) recording lease liabilities of $200 million, as of January 1, 2022, on the consolidated balance sheets. ROU assets represent the Company's right to use an underlying asset for the lease term, and lease liabilities represent the Company's obligation to make lease payments arising from the lease. Inspirato also reclassified prepaid expenses of $1.1 million and deferred rent balances (including tenant improvement allowances and other liability balances) of $7.9 million relating to the Company's existing lease arrangements as of December 31, 2021, into the ROU asset balance as of January 1, 2022.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

28. 37. On May 12, 2022, the Company filed its Form 8-K for first quarter period ended March 31, 2022, with press release attached, signed by CFO Neighbor. The Form 8-K stated, in pertinent part, as follows:

Item 2.02 Results of Operations and Financial Condition

On May 11, 2022, Inspirato Incorporated ("Inspirato" or the "Company") issued a press release announcing its financial results for the quarter ended March 31, 2022. A copy of the press release is furnished as Exhibit 99.1 to this current report on Form 8 K and is incorporated by reference herein…

The May 11, 2022 Press Release stated, in pertinent part, as follows:

14

2022 First Quarter Highlights:

● Record Setting Operational Results. As of March 31, 2022, Total Active Subscriptions, Annual Recurring Revenue, Total Nights Delivered and Controlled Accommodations all finished at the highest levels in Company history.

● Record Subscription Revenue, Travel Revenue, and Total Revenue. Record quarterly revenue of $82 million, an increase of 67% year-over-year, including quarterly records of $32 million of subscription revenue and $50 million of travel revenue, up 50% and 79% year-over-year, respectively…

Business and Financial Highlights

Total revenue for the quarter was $82 million, a 67% increase year-over-year and 20% increase compared to the fourth quarter of 2021. Increased revenue was driven by strong growth in both subscription and travel revenue as the Company continues to benefit from its innovative subscription model and robust travel demand…

Net loss for the first quarter of 2022 was $24 million compared to a net loss of $3.5 million in the first quarter of 2021. The difference in net loss between periods was due to increased gross margin being offset by increased corporate operating expenses and warrant fair value losses between periods. Adjusted Net Loss, a non-GAAP measure defined below, was $6.1 million for the first quarter of 2022 compared to $3.5 million in the comparable 2021 period. The difference in Adjusted Net Loss between periods is due to changes in the fair value of warrants. Adjusted EBITDA loss, a non-GAAP measure defined below, was approximately $3.5 million in the first quarter of 2022 compared to approximately $1.6 million in the first quarter of 2021. The difference in Adjusted EBITDA loss between periods was due to increased gross margin being offset by increased corporate operating expenses and warrant fair value losses between periods…

2022 Guidance

The Company expects its full-year 2022 revenue to be in a range of $350 million to $360 million. In addition, the Company expects its full-year Adjusted EBITDA loss to be in the range of $15 million to $25 million…

Reconciliation of Non- GAAP Financial Measures In addition to our results determined in accordance with GAAP, we use Adjusted Net Loss, Adjusted EBITDA, Adjusted EBITDA Margin and Free Cash Flow as part of our overall assessment of our performance, including the preparation of our annual operating budget and quarterly forecasts, to evaluate the effectiveness of our business strategies and to communicate with our board of directors concerning our business and financial performance. We believe that these non-GAAP financial measures provide useful information to investors about our business and financial performance, enhance their overall understanding of our past

15

performance and future prospects, and allow for greater transparency with respect to metrics used by our management in their financial and operational decision making. We are presenting these non-GAAP financial measures to assist investors in seeing our business and financial performance through the eyes of management, and because we believe that these non GAAP financial measures provide an additional tool for investors to use in comparing results of operations of our business over multiple periods with other companies in our industry…

29.38. On May 13, 2022, the Company filed its Form 10-Q with the SEC for the quarterly period ended March 31, 2022, signed by CEO Handler and CFO Neighbor. Attached to the Form 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Handler and Neighbor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.  The Form 10-Q provided, in pertinent part, as follows:

…Significant Accounting Policies

(a) Basis of Presentation

The accompanying unaudited condensed consolidated financial statements included herein have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") and applicable rules and regulations of the U.S. Securities and Exchange Commission (the "SEC") regarding interim financial reporting. Certain information and disclosures normally included in the financial statements prepared in accordance with GAAP have been condensed or omitted pursuant to such rules and regulations. These unaudited condensed consolidated financial statements should be read together with the Company's audited consolidated financial statements and accompanying notes as of and for the years ended December 31, 2021 and for the period from July 31, 2020 (inception) through December 31, 2020 and Inspirato LLC's audited consolidated financial statements and accompanying notes for the years ended December 31, 2020 and 2021 included in the final prospectus statement dated March 10, 2022 with the SEC pursuant to Rule 424(b)(3) under the Securities Act.

In management's opinion, these unaudited condensed consolidated financial statements have been prepared on the same basis as the audited annual financial statements and reflect all adjustments, which include

16

normal recurring adjustments, necessary for the fair statement of the Company's financial position as of March 31, 2022 and the results of operations for the three months ended March 31, 2022. The results of operations for the three months ended March 31, 2022 are not necessarily indicative of the results to be expected for the full year ending December 31, 2022 or any other future interim or annual period.

For the three months ended March 31, 2021, these unaudited condensed consolidated financial statements present the consolidated results of operations, comprehensive income (loss), cash flows and changes in equity of Inspirato LLC. The condensed consolidated balance sheet as of December 31, 2021 presents the financial condition of Inspirato LLC and its wholly-owned subsidiaries…

(d) Leases

The Company is party to operating lease agreements for its vacation homes, hotels and corporate offices. In February 2016, the FASB issued ASU No. 2016 02 ("ASC 842"), Leases, to require lessees to recognize all leases, with certain exceptions, on the balance sheet, while recognition on the statement of operations remains similar to legacy lease accounting. Subsequently, the FASB issued ASU No. 2018-10, Codification Improvements to Topic 842, Leases, ASU No. 2018 11, Targeted Improvements, ASU No. 2018-20, Narrow-Scope Improvements for Lessors, and ASU 2019-01, Codification Improvements, to clarify and amend the guidance in ASU No. 2016-02. ASC 842 eliminates real estate-specific provisions and modifies certain aspects of lessor accounting. The Company adopted ASC 842 as of January 1, 2022 using the modified retrospective approach ("adoption of the new lease standard"). This approach allows entities to either apply the new lease standard to the beginning of the earliest period presented or only to the consolidated financial statements in the period of adoption without restating prior periods. The Company has elected to apply the new guidance at the date of adoption without restating prior periods. In addition, the Company elected the package of practical expedients permitted under the transition guidance within the new standard, which allowed the Company to carry forward the historical determination of contracts as leases and lease classification and not reassess initial direct costs for historical lease arrangements. We also elected the practical expedient to not separate lease and non-lease components for all of our current classes of leases. Operating lease assets are included within operating lease right of use ("ROU") assets. The corresponding operating lease liabilities are included within other current liabilities and other long-term liabilities on the Company's condensed consolidated balance sheet as of March 31, 2022. The Company has elected not to present short-term leases on the consolidated balance sheet as these leases have a lease term of 12 months or less at lease inception

17

and do not contain purchase options or renewal terms that the Company is reasonably certain to exercise. All other lease assets and lease liabilities are recognized based on the present value of lease payments over the lease term at the later of ASC 842 adoption date or lease commencement date. Because most of the Company's leases do not provide an implicit rate of return, the Company used the Company's incremental borrowing rate based on the information available at adoption date or lease commencement date in determining the present value of lease payments. Adoption of the new lease standard on January 1, 2022 had a material impact on the Company's interim condensed consolidated financial statements. The most significant impacts related to the (i) recording of ROU assets of $193 million, and (ii) recording lease liabilities of $200 million, as of January 1, 2022 on the consolidated balance sheets. The Company also reclassified prepaid expenses of $1.1 million and deferred rent balances (including tenant improvement allowances and other liability balances) of $7.9 million relating to the Company's existing lease arrangements as of December 31, 2021, into the ROU asset balance as of January 1, 2022. ROU assets represent the Company's right to use an underlying asset for the lease term and lease liabilities represent the Company's obligation to make lease payments arising from the lease. The standard did not materially impact the Company's consolidated statement of operations and consolidated statement of cash flows and has had no impact on our debt covenants.

The cumulative effect of the changes made to the Company's consolidated balance sheet as of January 1, 2022 for the adoption of the new lease standard was as follows (in thousands):
…Liabilities
Current lease liability $ — $ 59,933 $ 59,933
Other current liabilities 457 (457) —
Long-term lease liability — 140,230 140,230
Other long-term liabilities 7,468 (7,468)…

Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations.

…Cost of revenue
Cost of revenue increased 46% from $32 million for the three months ended March 31, 2021 to $47 million for the three months ended March 31, 2022. This increase was primarily a result of higher direct travel costs resulting from increased travel as a result of higher travel demand and loosened travel restrictions. Lease payments on properties we lease also increased year over year due to new properties onboarded during the year. Our gross margin increased from 35% for the three months ended March 31, 2021 to 43% for the three months ended March 31, 2022 due largely to an increase

18

in subscriber base and a loosening of travel restrictions allowing for an increased volume of nightly travel stays

Item 4. Controls and Procedures.

Evaluation of Disclosure Controls and Procedures

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated, as of the end of the period covered by this Quarterly Report on Form 10-Q, the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d15(e) under the Securities Exchange Act of 1934, as amended, or the Exchange Act). Based on that evaluation, and as a result of the material weaknesses in internal control over financial reporting described below, our Chief Executive Officer and Chief Financial Officer concluded that, as of March 31, 2022, our disclosure controls and procedures were not effective at the reasonable assurance level. In light of this fact, our management has performed additional analyses, reconciliations, and other post-closing procedures and has concluded that, notwithstanding the material weaknesses in our internal control over financial reporting, the unaudited condensed consolidated financial statements for the periods covered by and included in this Quarterly Report on Form 10-Q fairly state, in all material respects, our financial position, results of operations and cash flows for the periods presented in conformity with GAAP.

Material Weaknesses in Internal Control over Financial Reporting

…As disclosed in the section titled "Risk Factors" in Part II, Item 1A and as of the end of the period covered by this Quarterly Report on Form 10-Q, our control deficiencies are as follows:

● We have lacked a sufficient number of personnel with the appropriate level of knowledge and experience in the application of GAAP, including the application of new accounting standards, and in the design and implementation of internal controls and have not had the necessary business processes and related internal controls. Additionally, we did not design and maintain effective controls over our financial closing and reporting processes.

● We did not design and maintain effective controls relevant to the preparation of our financial statements with respect to information technology general controls ("ITGCs"). Specifically, the material weaknesses relating to ITGCs are due to a lack of the design and implementation of certain ITGCs related to our financial applications and data being adequately restricted.

19

Remediation Plan

We have made significant progress toward remediation of these control deficiencies described above. We hired a number of key appropriately qualified personnel with the appropriate level of knowledge and experience in the application of GAAP, including three Certified Public Accountants since this material weakness was initially identified in 2021. We have engaged third party consultants to assist with the design and implementation of ITGCs, more specifically designing additional change management and access controls for our relevant IT applications to further restrict privileged access and implementing controls to review activities, which may materially affect our financial statements, for those users who have privileged access…

Changes in Internal Control Over Financial Reporting

Other than the material weakness remediation efforts underway, there were no changes in our internal control over financial reporting identified in connection with the evaluation required by Rule 13a-15(d) and 15d-15(d) of the Exchange Act that occurred during the quarter ended March 31, 2022, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting…

~~30.~~ 39. On August 8, 2022, the Company filed its Form 8-K with the SEC signed by

CFO Neighbor, attaching a Press Release dated August 8, 2022~~,~~. The Form 8-K stated,

in pertinent part, as follows:

…Record Setting Operational Results.

As of June 30, 2022, Total Active Subscriptions, Annual Recurring Revenue and Controlled Accommodations all finished at the highest levels in Company history. Record Subscription Revenue and Total Revenue. Record quarterly revenue of $84 million, an increase of 60% year-over-year, including record subscription revenue of $36 million, an increase of 50% year-over-year… Annual Recurring Revenue increased more than 50% year-over-year to a record $157 million…

2022 Guidance and 2023 Outlook

Anticipated 2022 total revenue between $350 million to $360 million, a year-over year increase of approximately 50%...

Management Commentary

20

"Our results in the second quarter demonstrated the many ways Inspirato offers incredible value to its subscribers, commented Co-Founder and Chief Executive Officer Brent Handler. Despite the macro uncertainty in the current environment, we  continue to set records from both a new supply and travel demand standpoint that have us positioned to meet our full-year revenue guidance of $350 to $360 million. As we shift our focus to the back half of the year and 2023, the emphasis is on quickly and efficiently returning to generating sustained profitability.…
Business and Financial Highlights

… Net loss for the second quarter of 2022 was $7.2 million compared to a net loss of $0.6 million in the second quarter of 2021. The difference in net loss between periods was due to increased gross margin being offset by increased corporate operating expenses. Adjusted Net Loss, a non-GAAP measure defined below, was $18 million for the second quarter of 2022 compared to an Adjusted Net Loss of $10 million in the comparable 2021 period. The primary difference in Adjusted Net Loss between periods was due to increased sales and marketing and operations expense partially offset by increased gross margin…

Reconciliation of Non- GAAP Financial Measures

In addition to our results determined in accordance with GAAP, we use Adjusted Net Loss, Adjusted EBITDA, Adjusted EBITDA Margin and Free Cash Flow as part of our overall assessment of our performance, including the preparation of our annual operating budget and quarterly forecasts, to evaluate the effectiveness of our business strategies and to communicate with our board of directors concerning our business and financial performance. We believe that these non-GAAP financial measures provide useful information to investors about our business and financial performance, enhance their overall understanding of our past performance and future prospects, and allow for greater transparency with respect to metrics used by our management in their financial and operational decision making. We are presenting these non-GAAP financial measures to assist investors in seeing our business and financial performance through the eyes of management, and because we believe that these non-GAAP financial measures provide an additional tool for investors to use in comparing results of operations of our business over multiple periods with other companies in our industry...

31.40. On August 10, 2022, the Company filed its Form 10-Q quarterly report for the period ended June 30, 2022 with the SEC, signed by CEO Handler and CFPOCFO Neighbor. Attached to the Form 10-Q were certifications pursuant to SOX signed by DefendantsCEO Handler and CFO Neighbor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over

21

financial reporting, and the disclosure of all fraud.  The Form 10-Q provided, in pertinent part, as follows:

> … Significant Accounting Policies
>
> (a) Basis of Presentation
>
> The accompanying unaudited condensed consolidated financial statements included herein have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") and applicable rules and regulations of the U.S. Securities and Exchange Commission (the "SEC") regarding interim financial reporting. Certain information and disclosures normally included in the financial statements prepared in accordance with GAAP have been condensed or omitted pursuant to such rules and regulations. These unaudited condensed consolidated financial statements should be read together with the Company's audited consolidated financial statements and accompanying notes as of and for the years ended December 31, 2021 and for the period from July 31, 2020 (inception) through December 31, 2020 and Inspirato LLC's audited consolidated financial statements and accompanying notes for the years ended December 31, 2020 and 2021 included in the final prospectus statement dated March 10, 2022 filed with the SEC pursuant to Rule 424(b)(3) under the Securities Act.
>
> In management's opinion, these unaudited condensed consolidated financial statements have been prepared on the same basis as the audited annual financial statements and reflect all adjustments, which include normal recurring adjustments, necessary for the fair statement of the Company's financial position as of June 30, 2022 and the results of operations for the three and six months ended June 30, 2022. The results of operations for the three and six months ended June 30, 2022 are not necessarily indicative of the results to be expected for the full year ending December 31, 2022 or any other future interim or annual period.
>
> For the three and six months ended June 30, 2021, these unaudited condensed consolidated financial statements present the consolidated results of operations, comprehensive income (loss), cash flows and changes in equity of Inspirato LLC. The condensed consolidated balance sheet as of December 31, 2021 presents the financial condition of Inspirato LLC and its wholly-owned subsidiaries…
>
> Critical Accounting Policies and Estimates

The discussion and analysis of our financial condition and results of operations are based upon our condensed consolidated financial statements, which have been prepared in accordance with GAAP…

Except for the policies described in "Note 2—Significant Accounting Policies" to our condensed consolidated financial statements included elsewhere in this Quarterly Report on Form 10-Q, including the accounting policy for leases as a result of the Company adopting the Financial Accounting Standards Board's (FASB) Accounting Standards Update (ASU) Leases (Topic 842) on January 1, 2022, there have been no significant changes from the significant accounting policies disclosed in Note 2 of the "Notes to Consolidated Financial Statements" of the audited consolidated financial statements for the year ended December 31, 2021, which are included in our prospectus filed pursuant to Rule 424(b)(3) on May 9, 2022. For more information, please refer to "Note 2—Summary of Significant Accounting Policies" to our unaudited condensed consolidated financial statements included in Part I, Item 1 of this Quarterly Report on Form 10-Q…

Item 4. Controls and Procedures

Evaluation of Disclosure Controls and Procedures

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated, as of the end of the period covered by this Quarterly Report on Form 10-Q, the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d15(e) under the Securities Exchange Act of 1934, as amended, or the Exchange Act). Based on that evaluation, and as a result of the material weaknesses in internal control over financial reporting described below, our Chief Executive Officer and Chief Financial Officer concluded that, as of June 30, 2022, our disclosure controls and procedures were not effective at the reasonable assurance level. In light of this fact, our management has performed additional analyses, reconciliations, and other post-closing procedures and has concluded that, notwithstanding the material weaknesses in our internal control over financial reporting, the unaudited condensed consolidated financial statements for the periods covered by and included in this Quarterly Report on Form 10-Q fairly state, in all material respects, our financial position, results of operations and cash flows for the periods presented in conformity with GAAP.

Material Weaknesses in Internal Control over Financial Reporting

…As disclosed in the section titled "Risk Factors" in Part II, Item 1A and as of the end of the period covered by this Quarterly Report on Form 10-Q, our control deficiencies are as follows:

23

● We have lacked a sufficient number of personnel with the appropriate level of knowledge and experience in the application of GAAP, including the application of new accounting standards, and in the design and implementation of internal controls and have not had the necessary business processes and related internal controls. Additionally, we did not design and maintain effective controls over our financial closing and reporting processes.

● We did not design and maintain effective controls relevant to the preparation of our financial statements with respect to information technology general controls ("ITGCs"). Specifically, the material weaknesses relating to ITGCs are due to a lack of the design and implementation of certain ITGCs related to our financial applications and data being adequately restricted.

Remediation Plan

We have made progress toward remediation of these control deficiencies described above. We hired a number of key appropriately qualified personnel with the appropriate level of knowledge and experience in the application of GAAP since this material weakness was initially identified in 2021 and we continue to recruit qualified personnel. We have engaged third party consultants to assist with the design and implementation of ITGCs, more specifically designing additional change management and access controls for our relevant IT applications to further restrict privileged access and implementing controls to review activities, which may materially affect our financial statements, for those users who have privileged access. While we believe these efforts will remediate the material weaknesses, these material weaknesses cannot be considered fully remediated until the applicable remedial controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively.

Changes in Internal Control Over Financial Reporting

Other than the material weakness remediation efforts underway, there were no changes in our internal control over financial reporting identified in connection with the evaluation required by Rule 13a-15(d) and 15d-15(d) of the Exchange Act that occurred during the quarter ended June 30, 2022, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting…

41.    Also on August 10, 2022, CEO Handler sold 15,779 shares of the Company's stock at $3.91 per share for proceeds of $61,695.89. The same day, CEO

24

Handler sold another 100 shares of the Company's stock at $4.90 per share for proceeds of $490.

42.   Additionally, on August 16, 2022, CEO Handler sold another 73,466 shares of the Company's stock at $3.48 per share for proceeds of $255,661.68.

32.43. The statements contained in ¶¶28-3137-40 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's unaudited condensed consolidated financial statements as of and for the quarterly periods ended March 31, 2022 and June 30, 2022 (collectively, the 'Non-Reliance Periods') included in the Quarterly Reports on Form 10-Q filed with the SEC for the Non-Reliance Periods, could no longer be relied upon; (2) the Quarterly Reports could no longer be relied upon due to the incorrect application of Accounting Standards Update (ASU) No. 2016-02, Leases (Topic 842) ("ASC 842")ASC 842 with respect to the assessment of right-of-use assets and liabilities, resulting in an understatement of both right-of-use assets and total lease liabilities of approximately 9% for each of the Non-Reliance Periods resulting in an understatement of total assets and total liabilities by approximately 5% for each of the Non-Reliance periods, and due to property-related and other expenses being under accrued in the first quarter, and over accrued in the second quarter, resulting in cost of revenue being understated by approximately 1% and overstated by approximately 5% in the first and second quarter, respectively (similarly, any previously issued or filed reports, press releases, earnings releases, and investor presentations or other communications

25

describing the Company's condensed consolidated unaudited financial statements and other related financial information covering the Non-Reliance Periods should no longer be relied upon); (3) the Company was not in compliance with the periodic filing requirements for continued listing set forth in Nasdaq Listing Rule 5250(c)(1) as a result of its failure to file its Quarterly Report on Form 10-Q for the quarter ended September 30, 2022 (the "Third Quarter Report") with the SEC by the required due date; and (4) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

~~The statements contained in ¶¶28-31 were also materially false and/or misleading based upon the accounts of former Company employees. These accounts further demonstrate the falsity of Defendants' statements, and that Defendants made such statements with scienter.~~DEFENDANTS ACTED WITH SCIENTER

44.    During the Class Period, Defendants had both the motive and opportunity to commit fraud. Defendants also had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time. Thus, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period. The following information is a non-exclusive listing of examples of facts demonstrating Defendants' scienter during the Class Period.

26

**CEO Handler's Suspiciously Timed Stock Sales
Support a Strong Inference of Scienter**

45.    As a result of the above false and misleading statements, the Company's share price was artificially inflated.  While in possession of material, non-public information, CEO Handler capitalized on the artificially inflated stock price by selling the Company's securities during the Class Period.

46.    Indeed, between August 10 and August 16, 2022, CEO Handler sold 89,345 shares of the Company's stock for proceeds of $317,847.57, while the price of the Company's stock was artificially inflated.  These proceeds constituted substantially more than what CEO Handler would have earned had investors known the truth about Inspirato's business operations.  Specifically, on August 10, 2022, CEO Handler sold 15,779 shares of the Company's stock at $3.91 per share for proceeds of $61,695.89.  The same day, CEO Handler sold another 100 shares of the Company's stock at $4.90 per share for proceeds of $490.  Additionally, on August 16, 2022, CEO Handler sold another 73,466 shares of the Company's stock at $3.48 per share for proceeds of $255,661.68.

47.    The shares sold by CEO Handler were highly suspicious in both amount (based on the sheer dollar value of shares sold) and timing (made during a time period where Defendants were making materially false statements to investors and/or failing to disclose material information that they had a duty to disclose).  For instance, on August 8, 2022 – two days before CEO Handler sold 15,879 shares of the Company's stock for proceeds of $62,195.89 – Defendants claimed, among other things, that Inspirato had achieved "record setting operational results" and that the Company's financial results were determined to be "in accordance with GAAP."  Also, on August 10, 2022 – the same

27

day on which CEO Handler and CFO Neighbor attested to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud – CEO Handler sold 15,879 shares of the Company's stock for proceeds of $62,195.89.

### The CW Accounts Support a Strong Inference of Scienter

33.48. The CW accounts also demonstrate that Defendants acted with scienter when they made their false and misleading statements. For instance, Confidential Witness ("CW") 1 worked at Inspirato from October 2019 to October 2021, serving as both an Accounting Manager and as a Senior Accounting Manager. CW1 stated that one of the biggest problems at the Company was that it built an internal technology without the assistance of anyone in finance or accounting. According to CW1, the Company's accounting was materially incorrect for many years. CW1 stated that CEO Handler did not get along with anyone in leadership of the Company's accounting or finance departments.

34.49. CW1 stated that CEO Handler believed that he did not have to comply with Generally Accepted Accounting Principles ("GAAP"),GAAP and that as a result, CEO Handler cut corners to get around GAAP compliance and was very comfortable defrauding people through the Company's financial statements. CW1 explained that CEO Handler constantly sought ways to be "creative" with the Company's accounting. CW1 stated that CEO Handler made the Company's accountants post journal entries into the Company's financial statements so they looked the way he wanted, not how GAAP required. According to CW1, the Company called them "management financials."

28

35.50. For example, CW1 stated if a new club member had to pay a $20,000 initiation fee, GAAP required it to be recognized over a year. According to CW1, however, CEO Handler demanded that the Company recognize all the revenue immediately although his demand did not comply with GAAP. CW1 also stated that with respect to the finance reporting that CW1 observed, the Company's finance team manipulated numbers for CEO Handler.

36.51. CW1 also stated that the Company did not have a history of valuing accounting personnel. CW1 stated that CW1 was hired to implement ASC 606, which CW1 described as a significant change in how companies were able to recognize revenue. Through this work, CW1 was able to discover issues with the Company's system of record and the platform that the Company created. According to CW1, this platform and any sort of transactions were supposed to operate in conjunction with the billing platform called Zuora. CW1 stated, however, that Zuora was implemented by someone in the Company's product department rather than someone in the accounting or finance department.

37.52. CW1 also stated that the Company invented its own currency call "travel perks." According to CW1, the Company compensated certain customers who made complaints with denominations of travel perks (for instance, 1000 travel perks for a property that was not properly cleaned). The customer could then use those travel perks to pay for trips. According to CW1, however, those travel perks were not cash, but the Company was improperly recognizing them as revenue, which CW1 described as fraud. CW1 stated that although the Company attempted to fix the issue before the 2020 audit, the root problem was that the Company was not willing to hire people with adequate

29

accounting or finance knowledge.  CW1 also stated that the Company did not have appropriate safeguards for internal controls and processes.  According to CW1, the Company's executives were not using any system controls and did not even know the purpose of such controls.  CW1 stated further that the Company did not possess people with experience to determine if particular journal entries were right or wrong.

38.53. CW1 also stated that in CW1's work on ASC 606, there were some provisions of ASC 606 that affected ASC 842.  CW1 stated that ASC 606 has rules on how to estimate components of a lease.  CW1 stated that as an example, a free trip might be offered to a leasing agent as a commission, and that ASC 606 governs the valuation of such items, which is inputted into ASC 842.  According to CW1, the personnel at the Company handling the work on ASC 842 did not have the background and experience to properly perform the work.  CW1 also stated that the Company received $9 million in a COVID grant, conducted a huge layoff, reduced salaries by 20%, collected the money, got it all forgiven, and paid it all out in executive bonuses for the Company's executives.

39.54. Additionally, CW2 served at Inspirato from September 2018 to January 2023.  CW2 served as an IT Manager from September 2018 to January 2022, and as an IT and Security Project Manager from November 2021 to January 2023.  CW2 managed the Company's compliance efforts.  In that capacity, CW2 worked with outside vendors to determine what the Company needed to do to become complaint, and how to implement the process in-house.

40.55. CW2 began at Inspirato handling all the Company's budgets for its IT department and the software for the entire Company.  CW2 discovered that during an initial assessment in approximately 2020, Inspirato had systems that the Company did

not properly identify as part of its record-keeping process.  CW2 stated that the Company

failed to remedy these determinations, and that no internal controls were implemented to

address the findings from the prior assessment.  CW2 also found that Inspirato had no

checks and balances in place to verify manual entries that were made in the Company's

financial reporting systems – a process the Company called "segregation of duties."  CW2

stated that with the Company's financial reporting, there were a lot of manual entries

made and no checks and balances on these processes.  CW2 stated that Inspirato's

personnel did not know how the Company's systems were built or how to change the

systems.

41.56. In 2022, CW2 began working with CFO Neighbor.  CW2 stated that CFO

Neighbor attended meetings in which the participants included various financial teams

and owners of apps.  CW2 stated that CFO Neighbor specifically attended meetings

involving the Company's financial department and was extremely involved in meetings

and issues that involved financial issues.  CW2 stated further that CEO Handler did not

take the Company's internal control issues seriously.  CW2 stressed that Inspirato's

executives did not prioritize the Company's internal controls, nor did they prioritize having

sufficient qualified personnel to handle the Company's accounting issues.

42.57. CW2 also stated that one of the most challenging teams was Inspirato's

finance team because the Company's finance personnel did not properly perform their

work.  For example, CW2 indicated that at the beginning of 2022, CW2 requested user

access review information from the Company's finance department.  CW2 stated that

CW2 did not receive any of the requested information until near the end of the year.  CW2

stated further that there were several additional categories of internal controls issues that

existed at Inspirato during CW2's tenure, including, but not limited to, user access/segregation of duties and financial reporting.

58.    CW3 worked at Inspirato between March 2016 to November 2022 in various positions, including: Manager, Brand Strategy and Content; Senior Manager, Brand Strategy; Director, Corporate Strategy; and Director, Strategy and Operations. CW3's role was working very closely with CEO Handler on new product initiatives or interacting with different departments on new products. CW3 worked closely with CEO Handler since 2019 and would spend at least an hour a day speaking with CEO Handler during the time that CW3 reported to CEO Handler. CW3 also worked closely with CFO Neighbor.

59.    CW3 stated that based upon CW3's experience with CEO Handler, CEO Handler would embellish information related to specific data. For instance, CW3 stated that in the course building pitch materials, CEO Handler would pick out information that made things sound as good as possible without providing a complete picture of the information. CW3 stated further that attorneys would have to correct the embellishments that CEO Handler attempted to portray. Additionally, CW3 stated that CEO Handler was not interested in information that was not favorable to the Company.

60.    CW3 stated further that most of the Company's executive team was working outside of their fields of background. For instance, CW3 stated that the head of care worked in marketing, the head of marketing was an attorney, and the head of technology and product was a general consultant. As a result, according to CW3, Inspirato's executive team did not have extensive experience in the fields they were managing.

61.    Additionally, CW3 said that the Company was chaotic and mismanaged. CW3 indicated that Inspirato's management team changed many times and that there

was a rotating door of CFOs. CW3 stated that the Company's accounting "was always an afterthought. Always, always, always." CW3 explained that these circumstances contributed to the decision of former CFO Michelle Shewchuk to quit. CW3 said that the subsequent CFO, Mark Hays, was terminated because of a lack of experience in taking a company public. CW3 stated further that the Company was reckless with money, and that Inspirato devoted resources to new products that CEO Handler envisioned without testing the product. CW3 also stated that there was no real C-suite at the Company (just the CEO and CFO) and that, as a result, there was no accountability in the executive team.

62.    CW3 also said that CEO Handler was accustomed to skirting around the truth and inflating numbers. For instance, CW3 stated that this became an issue when the Company started working with the SPAC. CW3 was responsible for the pitch deck, working with CEO Handler and CFO Neighbor. According to CW3, the Company's legal department found statements that CEO Handler would make or would propose to make that the legal department prohibited CEO Handler from making.

63.    CW4 worked at Inspirato from October 2020 to January 2023 as a Senior Financial Analyst. CW4 was focused primarily on modelling Inspirato's subscription revenue. CW4 reported to Andy Dutton, who serves as the Company's as Senior Vice President of Finance and Portfolio Management. As a Senior Financial Analyst, CW4 interfaced with company executives and attended meetings with company executives weekly or several times a week – meetings that included the CEO and CFO. During the meetings, participants would review the Company's financials, present forecasts, and discuss operational metrics, both back-end and forward-looking. CW4 stated that CEO

33

Handler exclaimed at the end of one meeting "God, I was not meant to run a company this big."

64.     CW5 worked at Inspirato from August 2020 to September 2023 in various capacities, including GL Accountant, Property Accountant, and Senior Property Accountant.  CW5 worked specifically on issues related to the Company's implementation of ASC 842.

65.     CW5 stated that when CW5 began at the Company in 2020, Inspirato did not have a CFO.  Instead, the Company had a Director of Accounting, who was not a Certified Public Accountant and was not well qualified.

66.     CW5 stated that once the Company adopted ASC 842, CW5 performed all of the Company's lease accounting.  CW5 was hired as a staff accountant, but was informed upon starting that the Company had over 500 leases and that CW5 would oversee the Company's leases.

67.     CW5 also said that an Enterprise Resource Planning ("ERP") system was supposed to calculate the Company's lease accounting in accordance with ASC 842.  However, CW5 stated that Defendants never properly set up the system.  CW5 said that once the ERP system was initiated, it malfunctioned and wreaked havoc on Inspirato's software system.  CW5 explained that Inspirato never had one single lease.  Instead, the Company had unusual stipulations and agreements contained in each lease.  As a result, CW5 stated that the Company's lease accounting had to be performed manually.

68.     Additionally, CW5 stated that the Company was failing to book deferred rent because of this manual process.  CW5 said that the Company's leases still had to be paid (and, thus, cash and expenses were going out each month), but that the Company could

34

not book those items accordingly until a manual process was performed for the lease accounting to revert back to ASC 840, the applicable standard before ASC 842 was implemented. As a result, Inspirato booked deferred rent at the end of 2021, but, according to CW5, Defendants should have been booking deferred rent monthly.

69. Additionally, CW5 stated that for an entire year, CW5 never had a manager. CW5 said that only CW5 and another senior accountant handled all of the Company's leases – more than 500 of them. CW5 stated that Phil Yoo, the Company's Controller, was the first to realize there was a massive problem with the Company's lease accounting, but he quickly resigned.

70. CW5 then had multiple telephone calls with CFO Neighbor in which CW5 stated to Neighbor that the Company lacked internal controls, review processes, and managers. CW5 also informed CFO Neighbor during these telephone calls that the accounting personnel would perform a month-end close and book journal entries and no one ever looked at them. According to CW5 – and as CW1 indicated – the accounting personnel could have posted whatever numbers they wanted and no one would ever know if they were right or wrong. CW5 also stated that CW5 sent a very lengthy email in the beginning of 2021 expressing these concerns to CFO Neighbor. CW5 stated that CFO Neighbor claimed he would look into fixing the issues.

71. CW5 also had conversations with CFO Neighbor regarding the misapplication of ASC 842, including at the time CW5 started at the Company. CW5 stated that it was a nightmare that landed on CW5's plate, and that, as a result, CW5 was very open about the issue and would speak to anyone who would listen. CW5 also recalls that in the fall of 2022 – around the time that Phil Yoo resigned – the Company held a

35

large meeting with all managers, account executives, and everyone involved in lease accounting during which this issue was discussed. CW5 stated that the participants acknowledged that the issue with lease accounting was a "big issue, and it's wrong." CW5 stated that CFO Neighbor was a participant during this meeting.

**Defendants' Access to Information and Hands-On Management Style Supports a Strong Inference of Scienter**

72. Defendants' access to information and the hands-on management style of CEO Handler and CFO Neighbor further support a strong inference of scienter. For instance, CW2 stated that CFO Neighbor attended meetings in which the participants included various financial teams and owners of apps. CW2 stated that CFO Neighbor specifically attended meetings involving the Company's financial department and was extremely involved in meetings and issues that involved financial issues. Additionally, CW6 served as the Vice President of Revenue Management and Channel Distribution at the Company from December 2021 to April 2023. CW6 had regular meetings with CEO Handler and CFO Neighbor. CW6 stated that Inspirato's CEO and CFO were micromanagers and very directive. CW6 stated that CW6 would have preferred more autonomy, but CEO Handler and CFO Neighbor were "engaged" and had a lot of strong opinions, with no real data. CW7 also corroborated the accounts of CW2 and CW6. CW7 served as the Vice President of IT at Inspirato from August 2014 to July 2023. CW7 also described CEO Handler as "hands-on."

**The Core Operations Inference Supports a Strong Inference of Scienter**

73. The facts alleged also support a strong inference of scienter because they relate to the core operations of the Company. Indeed, Inspirato leases most of its

36

properties, and the Company's obligations to landlords under these lease agreements extend for periods that often significantly exceed the duration of customers' subscriptions, often by many years.

74.    Additionally, the Company's cost of revenue includes costs directly related to delivering travel to its subscribers and guests, as well as depreciation and amortization related to leasehold improvements and equipment at residences. These costs include payments for properties that the Company leases, operating and maintenance costs of those properties (including on-site service personnel costs), as well as costs paid to Inspirato's hotel partners for subscriber stays.

75.    Inspirato, moreover, is a small company, which bolsters the inference of scienter created through the core operations inference. Indeed, as of June 30, 2022, the Company had only 368 operations employees.

**Inspirato's Substantial Remedial Actions Support a Strong Inference of Scienter**

76.    The substantial remedial actions implemented by the Company further support a strong inference of scienter. Specifically, on November 14, 2022, the Company announced the following:

> In connection with the restatements discussed above, the Company's management has re-evaluated the effectiveness of the Company's disclosure controls and procedures as of March 31, 2022 and June 30, 2022 and based on that evaluation, the Company's management has concluded its disclosure controls and procedures remained ineffective due to the unremediated material weaknesses previously disclosed in Item 4 "Controls and Procedures" in the Company's Quarterly Reports on Form 10-Q filed with the SEC for the Non-Reliance Periods. Management is developing a remediation plan for the material weaknesses.

77.    Moreover, during the Company's earnings call on December 20, 2022, CFO Neighbor stated that Inspirato added staff and implemented measures "for the first time

ever" ahead of an internal audit "tasked with delivering on the type of control environment that [one] would expect with a public company of our like kind of character."  These remedial measures add to the strong inference of scienter alleged because, as alleged more fully herein, they followed the Company's systemic and reckless disregard of Inspirato's internal financial controls.

**The Simplicity of the Applicable Accounting Principles Supports a Strong Inference of Scienter**

78.    The simplicity of the relevant accounting standards also bolsters the strong inference of scienter alleged.  Specifically, ASC 842 can be simple to understand, interpret, and apply, particularly for accounting professionals.  ASC 842 requires that lessees recognize assets and liabilities on the balance sheet for all leases with terms longer than 12 months.  ASC 842 also eliminates the classification of leases as either operating leases or finance leases for lessees.  Instead, lessees must recognize a right-of-use asset and a lease liability for virtually all lease contracts.  Moreover, because ASC 842 became effective for public companies before it became effective for private companies (like Inspirato at the time), many of the idiosyncrasies of the implementation of the standard became known to accounting professionals at private companies and were manageable.

**CFO Neighbor's Secret Termination Adds to the Strong Inference of Scienter Alleged**

79.    CFO Neighbor's secret termination from the Company – which Inspirato failed to disclose to investors at the time the termination occurred – also adds to the strong inference of scienter alleged.  On March 15, 2023, the Company filed a Form 8-K with the SEC announcing CFO Neighbor's termination as CFO and transition to Chief Strategy

38

Officer. Specifically, Inspirato stated that "R. Webster Neighbor and the Company agreed that he will continue to serve as Chief Financial Officer of the Company until the Company identifies and appoints a permanent replacement, at which point he will serve in the role of Chief Strategy Officer, reporting directly to the Company's Chief Executive Officer, with responsibility for activities related to corporate strategy, debt and equity capital markets, investor relations, real estate capital formation and investment."

80. On July 15, 2023, Inspirato terminated Neighbor from employment with the Company. Defendants did not disclose this fact to investors for another five weeks.

81. On August 21, 2023, Inspirato filed a Form 8-K with the SEC announcing that Neighbor and the Company had entered into a separation agreement and that Neighbor had "separated from employment with the Company effective July 15, 2023."

82. The fact that Defendants failed to disclose to investors Neighbor's termination from the Company at the time it occurred on July 15, 2023 – coupled with the other facts alleged herein – is highly suspicious and adds to the strong inference of scienter alleged.

83. These facts collectively demonstrate that Defendants acted with scienter when they made the false and misleading statements alleged herein.

**THE TRUTH BEGINS TO EMERGE**

~~43.~~84. On November 14, 2022, the Company filed its 8-K with the SEC signed by CFO Neighbor, stating, in pertinent part, as follows:

Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.

On November 8, 2022, the Audit Committee (the "Audit Committee") of the Board of Directors of Inspirato Incorporated (the "Company") concluded, after discussion with the Company's management, that the Company's

39

unaudited condensed consolidated financial statements as of and for the quarterly periods ended March 31, 2022 and June 30, 2022 (collectively, the "Non-Reliance Periods") included in the Quarterly Reports on Form 10-Q filed with the Securities and Exchange Commission (the "SEC") for the Non-Reliance Periods, should no longer be relied upon. This is due to the incorrect application of Accounting Standards Update (ASU) No. 2016-02, Leases (Topic 842) ("ASC 842") with respect to the assessment of right-of-use assets and liabilities, resulting in an understatement of both right-of-use assets and total lease liabilities of approximately 9% for each of the Non-Reliance Periods resulting in an understatement of total assets and total liabilities by approximately 5% for each of the Non-Reliance periods, and due to property-related and other expenses being under accrued in the first quarter, and over accrued in the second quarter, resulting in cost of revenue being understated by approximately 1% and overstated by approximately 5% in the first and second quarter, respectively. Similarly, any previously issued or filed reports, press releases, earnings releases, and investor presentations or other communications describing the Company's condensed consolidated unaudited financial statements and other related financial information covering the Non-Reliance Periods should no longer be relied upon.

~~The incorrect application and assessments pursuant to ASC 842 did not have a material impact on the Company's results of operations and had no impact on the Company's revenues or operating cash flows for each of the Non-Reliance Periods.~~

\* \* \*

The Company intends to restate the unaudited condensed consolidated financial statements for the Non-Reliance Periods as soon as practicable by filing amended Quarterly Reports on Form 10-Q for the Non-Reliance Periods. Accordingly, investors and others should rely only on financial information and other disclosures regarding the Non-Reliance Periods once the Company restates its unaudited condensed consolidated financial statements for the Non-Reliance Periods.

The above referenced misstatements are preliminary, unaudited and subject to further change in connection with the completion of the amended Quarterly Reports on Form 10-Q/A for the Non-Reliance Periods to be filed with the SEC.

The Audit Committee and management have discussed the matters disclosed in this Current Report on Form 8-K with the Company's independent registered public accounting firm, BDO USA LLP.

In connection with the restatements discussed above, the Company's management has re-evaluated the effectiveness of the Company's disclosure controls and procedures as of March 31, 2022 and June 30, 2022

40

and based on that evaluation, the Company's management has concluded its disclosure controls and procedures remained ineffective due to the unremediated material weaknesses previously disclosed in Item 4 "Controls and Procedures" in the Company's Quarterly Reports on Form 10-Q filed with the SEC for the Non-Reliance Periods. Management is developing a remediation plan for the material weaknesses.

44.85. On November 14, 2022, the Company filed its Form12b-25 with the SEC

providing Notice of Late Filing, signed by CFO Neighbor, which stated, in pertinent part,

as follows:

Inspirato Incorporated (the "Company") will not, without unreasonable effort and expense, be able to file its Quarterly Report on Form 10-Q for the quarter ended September 30, 2022 (the "Third Quarter Report") with the Securities and Exchange Commission (the "SEC") within the prescribed time period due to delays in completion of the financial statements for the quarter ended September 30, 2022. The delay in the issuance of the Company's financial statements for the quarter ended September 30, 2022 is attributable to the pending restatement of the Company's condensed consolidated unaudited financial statements as of and for the quarters ended March 31, 2022 and June 30, 2022 (collectively, the "Non-Reliance Periods") included in the Quarterly Reports on Form 10-Q filed with the SEC for the Non Reliance Periods, as previously disclosed in the Company's Current Report on Form 8- K filed on November 14, 2022 with the SEC.

The Company's financial statements for the quarter ended September 30, 2022 cannot be finalized and the Third Quarter Report filed with the SEC until the restated financial statements for the Non-Reliance Periods are completed. The Company's review of its condensed consolidated unaudited financial statements for the Non Reliance Periods, including the determination of all required adjustments thereto, and the preparation of the restatements thereof, is ongoing. Although the Company expects to restate the unaudited condensed consolidated financial statements for the Non-Reliance Periods as soon as practicable by filing amended Quarterly Reports on Form 10-Q/A for each of the respective Non-Reliance Periods, for the reasons discussed above, the Company does not currently expect to file the Third Quarter Report within the timeframe specified by Rule 12b-25.

In connection with the restatements discussed above, the Company's management has re-evaluated the effectiveness of the Company's disclosure controls and procedures as of March 31, 2022 and June 30, 2022 and based on that evaluation, the Company's management has concluded its disclosure controls and procedures remained ineffective due to the unremediated material weaknesses previously disclosed in Item 4 "Controls and Procedures" in the Company's Quarterly Reports on Form 10-Q filed

41

with the SEC for the Non-Reliance Periods. Management is developing a remediation plan for the material weaknesses.

45. 86. On this news, Inspirato's stock price fell $0.27 per share, or 11.89%, to close at $2.00 per share on November 14, 2022.

46. 87. On November 23, 2022, the Company filed its Form 8-K filed with SEC signed by CFO Neighbor, attaching a Press Release, disclosing the Company's receipt of a Notice from the Listing Qualifications Department of NASDAQ. The 8-K stated, in pertinent part, as follows:

> Item 3.01. Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard; Transfer of Listing.
>
> On November 18, 2022, Inspirato Incorporated (the "Company") received a notice (the "Notice") from the Listing Qualifications Department of The Nasdaq Stock Market LLC ("Nasdaq") notifying the Company that it is not in compliance with the periodic filing requirements for continued listing set forth in Nasdaq Listing Rule 5250(c)(1) (the "Rule") as a result of its failure to file its Quarterly Report on Form 10-Q for the quarter ended September 30, 2022 (the "Third Quarter Report") with the Securities and Exchange Commission (the "SEC") by the required due date. The Notice stated that, under Nasdaq rules, the Company has 60 calendar days, or until January 17, 2023, to submit a plan to regain compliance with Nasdaq's continued listing requirements. If the plan is accepted, Nasdaq may grant an extension of up to 180 calendar days, or until May 15, 2023, to regain compliance. The Company can also regain compliance with Nasdaq's continued listing requirements at any time before January 17, 2023, by filing the Third Quarter Report with the SEC, and continuing to comply with Nasdaq's other continued listing requirements. The Company intends to file with the SEC the Third Quarter Report and regain compliance with Nasdaq's continued listing requirements as soon as practicable…
>
> As previously disclosed in the Current Report on Form 8-K filed on November 14, 2022 by the Company, on November 8, 2022, the Audit Committee (the "Audit Committee") of the Board of Directors of the Company concluded, after discussion with the Company's management, that the Company's unaudited condensed consolidated financial statements as of and for the quarterly periods ended March 31, 2022 and June 30, 2022 (collectively, the "NonReliance Periods"), included in the Quarterly Reports on form 10-Q filed with the SEC for the Non-Reliance Periods, should no longer be relied upon. This is due to the incorrect application of Accounting

Standards Update (ASU) No. 2016-02, Leases (Topic 842) ("ASC 842") with respect to the assessment of right-of-use assets and liabilities, resulting in an understatement of both right-of-use assets and total lease liabilities of approximately 9% for each of the Non-Reliance Periods resulting in an understatement of total assets and total liabilities by approximately 5% for each of the Non-Reliance periods, and due to property-related and other expenses being under accrued in the first quarter, and over accrued in the second quarter, resulting in cost of revenue being understated by approximately 1% and overstated by approximately 5% in the first and second quarter, respectively. Similarly, any previously issued or filed reports, press releases, earnings releases, and investor presentations or other communications describing the Company's condensed consolidated unaudited financial statements and other related financial information covering the Non-Reliance Periods should no longer be relied upon…

The Company intends to restate the unaudited condensed consolidated financial statements for the Non-Reliance Periods as soon as practicable by filing amended Quarterly Reports on Form 10-Q/A for the Non-Reliance Periods. Accordingly, investors and others should rely only on financial information and other disclosures regarding the Non-Reliance Periods once the Company restates its unaudited condensed consolidated financial statements for the Non-Reliance Periods.

Also on November 14, 2022 the Company filed a Notification of Late Filing on Form 12b-25 disclosing that it would not, without unreasonable effort and expense, be able to file the Third Quarter Report with the SEC within the prescribed time period due to delays in completion of the financial statements for the quarter ended September 30, 2022. The delay in the issuance of the Company's financial statements for the quarter ended September 30, 2022 is attributable to the pending restatement of the Company's condensed consolidated unaudited financial statements for the Non-Reliance Periods.

The above referenced misstatements are preliminary, unaudited and subject to further change in connection with the completion of the amended Quarterly Reports on Form 10-Q/A for the Non-Reliance Periods to be filed with the SEC…

In connection with the restatements discussed above, the Company's management has re-evaluated the effectiveness of the Company's disclosure controls and procedures as of March 31, 2022 and June 30, 2022 and based on that evaluation, the Company's management has concluded its disclosure controls and procedures remained ineffective due to the unremediated material weaknesses previously disclosed in Item 4 "Controls and Procedures" in the Company's Quarterly Reports on Form 10-Q filed

43

with the SEC for the Non-Reliance Periods. Management is developing a remediation plan for the material weaknesses.

47.88. On November 23, 2022, the Company issued a Press Release in connection with the foregoing 8-K, which stated, in pertinent part, as follows:

> … Inspirato Incorporated (NASDAQ: ISPO) (the "Company"), the innovative luxury hospitality company, today announced that on November 18, 2022, it received a notice (the "Notice") from the Listing Qualifications Department of The Nasdaq Stock Market LLC ("Nasdaq") notifying the Company that it did not comply with Nasdaq's Listing Rule 5250(c)(1) (the "Rule") for continued listing because it had not filed its Quarterly Report on Form 10-Q for the quarter ended September 30, 2022 (the "Form 10-Q") by the required due date.

48.89. On this news, Inspirato's stock price fell $0.06 per share, or 3.21%, to close at $1.81 per share on November 25, 2022.

49.90. On December 15, 2022, after market hours, the Company filed its Form 10-Q/A with SEC to amend its Quarterly Report on Form 10-Q for the quarter ended March 31, 2022, that was originally filed with the SEC on May 13, 2022 (the "Original Report"), signed by CEO Handler and CFO Neighbor.  The 10-Q/A stated, in pertinent part, as follows:

> Inspirato Incorporated (the "Company") is filing this Amendment No. 1 on Form 10-Q/A (the "Amended Report") to amend its Quarterly Report on Form 10-Q for the quarter ended March 31, 2022, that was originally filed with the U.S. Securities and Exchange Commission (the "SEC") on May 13, 2022 (the "Original Report"), to restate certain items presented in the Original Report (the "Restatement"). This Amended Report includes a restatement of the Company's unaudited condensed consolidated financial statements as of and for the three months ended March 31, 2022 and amends certain other information in the Original Report as further described below. Background

> As disclosed in the Company's Current Report on Form 8-K, filed with the SEC on November 14, 2022, the Restatement is to correct errors that resulted from (i) the incorrect application of Accounting Standards Update (ASU) No. 2016-02, Leases (Topic 842) ("ASC 842") with respect to the assessment of right-of-use assets and lease liabilities and (ii) the under accrual of liabilities and property related and other expenses as of March 31, 2022. The incorrect application of ASC 842 led to an understatement of

44

$25 million of the right-of-use assets and total lease liabilities as of March 31, 2022. Separately, property-related and other expenses were understated by $0.3 million during the three-months ended March 31, 2022… In connection with the Restatement, the Company's management concluded that as of March 31, 2022, its disclosure controls and procedures remained ineffective at a reasonable assurance level due to the unremediated material weaknesses in its internal control over financial reporting previously disclosed in Part I, Item 4. "Controls and Procedures" of the Original Report…

Items Amended in this Amended Report

The following sections in the Original Report are revised in this Amended Report, solely as a result of, and to reflect, the Restatement

● Part I – Item 1. Financial Information

● Part I – Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations

● Part I – Item 4. Controls and Procedures

● Part II – Item 1A. Risk Factors

● Part II – Item 6. Exhibits and Signatures In addition, in accordance with Rule 12b-15 under the Securities Exchange Act of 1934, as amended, Part II, Item 6 of the Original Report has been amended to include the currently-dated certifications  from the Company's principal executive officer and principal financial officer as Exhibits 31.1, 31.2, 32.1 and 32.2…

Item 4. Controls and Procedures.

Evaluation of Disclosure Controls and Procedures

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated, as of the end of the period covered by this Amended Quarterly Report on Form 10-Q/A, the effectiveness of our disclosure controls and procedures (as defined in Rules 13a15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, or the Exchange Act). Based on that evaluation, and as a result of the material weaknesses in internal control over financial reporting described below, our Chief Executive Officer and Chief Financial Officer concluded that, as of March 31, 2022, our disclosure controls and procedures were not effective at the reasonable assurance level…

45

... As disclosed in the section titled "Risk Factors" in Part II, Item 1A and as of the end of the period covered by this Amended Quarterly Report on Form 10 Q/A, our material weaknesses are as follows:

● We have lacked a sufficient number of personnel with the appropriate level of knowledge and experience in the application of GAAP, including the adoption and ongoing accounting for leases under ASC 842, and in the design and implementation of internal controls and have not had the necessary business processes and related internal controls. Additionally, we did not design and maintain effective controls over our financial closing and reporting processes. This material weakness resulted in the restatement of our previously issued consolidated financial statements for the quarterly periods ended March 31, 2022, as described elsewhere in this Quarterly Report on Form 10-Q/A, and June 30, 2022 (collectively, the "Non-Reliance Periods") to correct errors that resulted from (i) the incorrect application of ASC 842 with respect to the assessment of right-of-use assets and lease liabilities and (ii) the under accrual of liabilities and property-related and other expenses as of March 31, 2022 and the over accrual of liabilities and property-related and other expenses as of June 30, 2022.

● We did not design and maintain effective controls relevant to the preparation of our financial statements with respect to information technology general controls ("ITGCs"). Specifically, the material weaknesses relating to ITGCs are due to a lack of the design and implementation of certain ITGCs related to our financial applications and data being adequately restricted.

… We have identified and are currently working to remediate material weaknesses in internal control over financial reporting related to our financial closing and reporting process and to our information technology general controls ("ITGCs")…

The following material weaknesses remain unremediated as of March 31, 2022:

● We have lacked a sufficient number of personnel with the appropriate level of knowledge and experience in the application of GAAP, including the adoption and ongoing accounting for leases under ASC 842, and in the design and implementation of internal controls and have not had the necessary business processes and related internal controls. Additionally, we did not design and maintain effective controls over our financial closing and reporting processes. This material weakness resulted in the restatement of our previously issued consolidated financial statements for the Non-Reliance Periods to correct errors that resulted from (i) the incorrect application of ASC 842 with respect to the assessment of right-of-use

46

assets and lease liabilities and (ii) the under accrual of liabilities and property-related and other expenses as of March 31, 2022 and the over accrual as of June 30, 2022.

● We did not design and maintain effective controls relevant to the preparation of our financial statements with respect to ITGCs. Specifically, the material weaknesses relating to ITGCs are due to a lack of the design and implementation of certain ITGCs related to our financial applications and data being adequately restricted. We continue to remediate the material weaknesses identified. We are committed to continuing to improve our internal control over financial reporting and will continue to review and improve our internal control over financial reporting controls and ITGCs. described above. We have hired a number of key appropriately qualified personnel with the appropriate level of knowledge and experience in the application of GAAP, including four Certified Public Accountants with one designated as the Lead Property Accountant. We have also engaged third party consultants to assist with the design and implementation of ITGCs, more specifically designing additional change management and access controls for our relevant IT applications to further restrict privileged access and implementing controls to review activities for those users who have privileged access. In addition, due to the material weaknesses in internal control over financial reporting, we have also determined that our disclosure controls and procedures are ineffective. …[A]s a result of the material weaknesses and related restatements due to the matters descried above, we were not able to timely file our Quarterly Report on form 10-Q for the period ended September 30, 2022 (the "Third Quarter Report") and received a delisting notice from Nasdaq…

~~50.~~91. On this news, Inspirato's stock price fell $0.10 per share, or 6.58%, to close at $1.41 per share on December 16, 2022.

~~51.~~92. As a result of Defendants' wrongful acts and ~~omissions~~half-truths and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

~~**POST CLASS PERIOD EVENTS**~~

~~52. On January 18, 2023, the Company issued a press release announcing "a plan to streamline operations. The plan includes a workforce reduction, effective immediately, that impacts approximately 12% of the Company's current staff."~~

53.     On March 15, 2023, the Company issued a Form 8-K with the SEC announcing that "[o]n March 15, 2022, R. Webster Neighbor and the Company agreed that he will continue to serve as Chief Financial Officer of the Company until the Company identifies and appoints a permanent replacement, at which point he will serve in the role of Chief Strategy Officer, reporting directly to the Company's Chief Executive Officer, with responsibility for activities related to corporate strategy, debt and equity capital markets, investor relations, real estate capital formation and investment.   The Company thanks Mr. Neighbor for his dedicated service as Chief Financial Officer."

54.     On March 22, 2023, the Company issued a Form 8-K with the SEC announcing that "effective March 21, 2023, Inspirato Incorporated (the "Company") appointed Robert Kaiden as the Company's Chief Financial Officer. Mr. Kaiden will succeed R. Webster Neighbor, whose transition to the Company's Chief Strategy Officer, upon the appointment of a new chief financial officer, was previously announced on March 15, 2023."

55.     On May 3, 2023, the Company received a notice from The Nasdaq Stock Market ("Nasdaq") that the Company was not in compliance with Nasdaq's Listing Rule 5450(a)(1), because the minimum bid price of the Company's Class A common stock was below $1.00 per share for 30 consecutive business days.

56.     On August 21, 2023, the Company filed a Form 8-K with the SEC that stated the following:

On August 21, 2023, Inspirato LLC, a wholly owned subsidiary of Inspirato Incorporated (the "Company"), and R. Webster Neighbor, the Company's former Chief Financial Officer, entered into a Separation and Release Agreement (the "Separation Agreement"). Pursuant to the Separation Agreement, Mr. Neighbor will be entitled to (i) severance payments in an aggregate gross amount of $900,000, representing two years of Mr. Neighbor's annual base salary; (ii) bonus payments in an aggregate gross amount of $450,000, representing 200% of Mr. Neighbor's 2023 annual target bonus; (iii) accelerated vesting of 1,014,615 shares of the

48

Company's Class V common stock that were unvested as of the date of Mr. Neighbor's termination; (iv) accelerated vesting of 252,736 shares of the Company's Class A common stock that were subject to unvested restricted stock units ("RSUs") as of the date of Mr. Neighbor's termination (with the remaining512,149 RSUs that were unvested as of the date of Mr. Neighbor's termination being forfeited for no consideration); and (v) copayment of Mr. Neighbor's COBRA premiums for a period of up to 24 months, in an amount equal to the employer portion of Mr. Neighbor's health insurance had Mr. Neighbor remained employed by the Company through such period. All cash payments will be subject to applicable tax withholding and will, in general, be paid in 48 bimonthly installments in accordance with the terms of the Separation Agreement.

In consideration for such benefits, Mr. Neighbor agreed to a general release of claims in favor of the Company, not to make disparaging statements about the Company and to customary confidentiality and cooperation covenants. The foregoing summary of the Separation Agreement is qualified in its entirety by reference to the full text of the Separation Agreement, a copy of which is filed as Exhibit 10.1 hereto and is incorporated herein by reference.

## CLASS ACTION ALLEGATIONS

57. 93. Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all those who purchased the Company's securities during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have, or had, a controlling interest.

58. 94. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the

49

Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

59.95. Plaintiff's claims are typical of the claims of the members of the Class, since all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law alleged herein.

60.96. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

61.97. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts constituted violations of the federal securities laws;

(b)     whether Defendants' statements made to the investing public during the Class Period misrepresented material facts concerning the Company's business, operations, and financial condition;

(c)     whether the price of the Company's securities was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

62.98. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively

small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. Additionally, there will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

63.99. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the Company's securities. Defendants' conduct, moreover, operated as a fraud or deceit on Class Period purchasers of the Company's securities by failing to disclose, and misrepresenting, the adverse facts detailed herein. As Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of the Company's securities declined significantly as the prior artificial inflation dissipated from the Company's stock price.

64.100. As a result of the purchases of the Company's securities during the Class Period, Plaintiff and the other members of the Class suffered economic loss (damages) under the federal securities laws. Defendants' false and misleading statements had the intended effect, and caused, the Company's securities to trade at artificially inflated levels throughout the Class Period.

65.101. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of the Company's business and prospects. As the truth regarding the Company was revealed to the market, the price of the Company's securities fell significantly. These declines removed the inflation from the price of the Company's securities, causing real economic loss to investors who purchased the Company's securities during the Class Period.

66.102.    The declines in the price of the Company's securities after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in the Company's securities negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic, or industry factors, or by Company-specific facts unrelated to defendants' fraudulent conduct.

67.103.    The economic loss (damages) suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of the Company's securities and the subsequent significant decline in the value of the Company's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:
FRAUD ON THE MARKET DOCTRINE**

68.104.    At all relevant times, the market for the Company's securities was an efficient market for the following reasons, among others:

(a)    The Company's securities met the requirements for listing, and was listed and actively traded on, NASDAQ, a highly efficient, electronic stock market;

(b)    As a regulated issuer, the Company filed periodic public reports with the SEC and NASDAQ;

(c)    The Company regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public

52

disclosures, such as communications with the financial press and other similar reporting services; and

(d)    The Company was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.   Each of these reports was publicly available and entered the public marketplace.

69.105.      As a result of the foregoing, the market for the Company's securities promptly digested current information concerning the Company from all publicly available sources and reflected such information in the prices of the Company's securities.  Under these circumstances, all purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of the Company's securities at artificially inflated prices and a presumption of reliance applies.

## **NO SAFE HARBOR**

70.106.      The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements alleged herein.  Many of the specific statements alleged herein were not identified as "forward-looking statements" when made, and thus are not entitled to protection under the safe harbor provision.  Additionally, to the extent that there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements alleged herein, Defendants are liable for those false

53

forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

**<u>COUNT I</u>**
**Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against All Defendants**

71.107.       Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

72.108.       During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew, or were deliberately reckless in not knowing, were misleading.  These statements were false and misleading because they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

109.   To the extent that the claims alleged herein are based upon the omission of information, such omissions were made in connection with the misrepresentations and misleading half-truths alleged herein and were not based upon pure omissions.

73.110.       Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact/and or omitted to state material facts necessary to make the statements made not misleading; and (3) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

54

74.111.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's securities.  Plaintiff and the Class would not have purchased the Company's securities at the prices they paid – or at all – if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

75.112.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT II
### Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

76.113.    Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

77.114.    The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and/or intimate knowledge of the Company's statements filed with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements alleged to be false and misleading herein.

78.115.    The Individual Defendants, moreover, were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged to be false and misleading herein.  The Individual Defendants were provided with, or had unlimited access to, such documents and statements prior to,

55

and/or shortly after these statements were issued, and therefore had the ability to prevent the issuance of the statements and/or cause the statements to be corrected.  Additionally, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and had the power to control or influence the particular transactions giving rise to the securities violations.

79.116.    The Individual Defendants all had ultimate authority over the Company's statements, including controlling the content of such statements and whether and how to communicate such statements to the public.

80.117.    By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff, and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

56

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated:  ~~August 28, 2023~~November 5, 2024                    GLANCY
PRONGAY & MURRAY LLP

By:  */s/ Ex Kano S. Sams II*
Robert V. Prongay
Ex Kano S. Sams II
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
rprongay@glancylaw.com
esams@glancylaw.com
clinehan@glancylaw.com

*Attorneys for Lead Plaintiff Ilan Bouzaglo*

THE LAW OFFICES OF FRANK R. CRUZ
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

*Additional Counsel for Lead Plaintiff*

57

## PROOF OF SERVICE

I hereby certify that on this 5th day of November, 2024, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*s/ Ex Kano S. Sams II*
Ex Kano S. Sams II

# EXHIBIT B

**UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO**

| | |
|---|---|
| ILAN BOUZAGLO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>INSPIRATO INCORPORATED, BRENT HANDLER, AND R. WESTER NEIGHBOR,<br><br>Defendants. | Civil Action No. 1:23-cv-00438-RMR-SBP<br><br>JURY TRIAL DEMANDED<br><br><u>CLASS ACTION</u> |

---

**[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

---

## TABLE OF CONTENTS

NATURE OF THE ACTION ........................................................................................ 1

JURISDICTION AND VENUE.................................................................................... 2

PARTIES .................................................................................................................. 3

SUBSTANTIVE ALLEGATIONS............................................................................... 7

DEFENDANTS' FALSE AND MISLEADING STATEMENTS................................... 14

DEFENDANTS ACTED WITH SCIENTER ............................................................. 26

THE TRUTH BEGINS TO EMERGE ...................................................................... 39

CLASS ACTION ALLEGATIONS ........................................................................... 47

LOSS CAUSATION ................................................................................................ 49

APPLICABILITY OF PRESUMPTION OF RELIANCE:........................................... 51

FRAUD ON THE MARKET DOCTRINE ................................................................. 51

NO SAFE HARBOR ............................................................................................... 52

PRAYER FOR RELIEF........................................................................................... 54

JURY DEMAND...................................................................................................... 55

Lead Plaintiff Ilan Bouzaglo ("Plaintiff") alleges the following based upon the investigation of Plaintiff's counsel. This investigation included, among other things, a review of: (1) United States Securities and Exchange Commission ("SEC") filings by Inspirato Incorporated ("Inspirato" or the "Company"); (2) the accounts of former employees of the Company; (3) analysts' reports and advisories about the Company; and (4) press releases, media reports, and other public statements issued by, or about, the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action brought on behalf of all persons and/or entities who purchased the Company's securities between May 11, 2022, and December 15, 2022, inclusive ("Class Period"). Plaintiff seeks to pursue remedies under the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.      Inspirato is a travel subscription company. In February 2022, the private travel club closed its business combination with a Special Purpose Acquisition Company ("SPAC") and began trading on the NASDAQ stock market.

3.      On December 15, 2022, however, Inspirato was forced to restate its financial statements due to the misapplication of the applicable standard for lease accounting. As alleged herein, this restatement was not an innocent mistake. Rather, Defendants knowingly and/or recklessly disregarded the risks associated with the Company's lease accounting and the falsity of Inspirato's statements regarding the Company's lease accounting.

1

4.     For instance, one former Company accountant indicated that the Company's software system was supposed to calculate the Company's lease accounting in accordance with the applicable standard.  Defendants, however, never properly set up the system.  As a result, the system malfunctioned and wreaked havoc on Inspirato's software system, and the Company's lease accounting had to be performed manually.  Among other things, this manual process led to the Company's failure to properly book deferred rent.

5.     Additionally, former company employees had multiple conversations with (and sent lengthy emails to) the Company's executives regarding these issues.  The former employees also describe meetings in which Defendants characterized Inspirato's lease accounting as a "big issue, and it's wrong."

6.     Significantly, Inspirato's Chief Executive Officer ("CEO") profited handsomely by selling a significant amount of Inspirato stock while the price of the Company's stock was artificially inflated.  Conversely, the Company's investors were unaware of what Inspirato's insiders knew, and they suffered significant losses when the truth was finally revealed.  As a result, Plaintiff brings this action on his own behalf and on behalf of a class of investors for the violations of the federal securities laws alleged herein.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under, and pursuant to, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

8.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

9.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred, in substantial part, in this District.

10.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of an electronic securities exchange located within this District.

## PARTIES

11.    As set forth in the previously filed certification which is incorporated by reference herein, Plaintiff purchased the Company's securities during the Class Period and has been damaged thereby.

12.    Defendant Inspirato purports to be a subscription-based luxury travel company that purports to provide unique solutions for: (i) affluent travelers seeking superior service and certainty across a wide variety of accommodations and experiences; and (ii) hospitality suppliers who want to solve pain points that include monetizing excess inventory and efficiently outsourcing the hassle involved in managing rental properties. Inspirato is headquartered at 1544 Wazee Street, Denver, CO 80202 and incorporated in Delaware.  Inspirato shares are listed on NASDAQ under ticker symbol ISPO.

13.    Defendant Brent Handler ("Handler") was at all relevant times the Company's CEO and Director.  CEO Handler co-founded Inspirato with his brother Brad

3

Handler.  CEO Handler has served as CEO and on the Company's Board of Directors since February 2022.  CEO Handler has also served as the CEO of Inspirato LLC and as a member of its Board of Managers since January 2010.  Before co-founding Inspirato, CEO Handler co-founded Exclusive Resorts and served as its President from 2002 to 2009.  CEO Handler holds a Bachelor of Science degree in Business from the University of Colorado, Boulder.

14.    Defendant R. Webster Neighbor ("Neighbor") was at all relevant times the Company's Chief Financial Officer ("CFO").  CFO Neighbor began serving as CFO of the Company in February 2022, and previously served as the CFO of Inspirato LLC beginning in November 2020.  Before joining Inspirato, CFO Neighbor was a private investor and independent consultant from April 2016 through November 2020.  CFO Neighbor has also served as Executive Vice President of Strategic Initiatives of the Irvine Company, a real estate development and investment company, from 2013 to March 2016, and as CFO and Treasurer of Archstone, a Real Estate Investment Trust, from 2012 to 2013.  CFO Neighbor also served as a Senior Vice President at Lehman Brothers. CFO Neighbor holds a Bachelor of Science degree in Civil Engineering from Oregon State University and a Master of Business Administration from the University of North Carolina Kenan-Flagler Business School.  CFO Neighbor was second only to CEO Handler in the management of Inspirato's financial affairs.

15.    Defendants Inspirato, Handler, and Neighbor are collectively referred to herein as "Defendants."  Defendants Handler and Neighbor are collectively referred to herein as the "Individual Defendants."

16.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of the Company, were privy to confidential and proprietary information concerning the Company, its operations, finances, financial condition, and present and future business prospects.  Additionally, as set forth more fully below, the Individual Defendants had access to material adverse non-public information concerning the Company.  Because of their positions within the Company, the Individual Defendants had access to non-public information about the Company's business, finances, products, markets, and present and future business prospects via internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew, or were reckless in not knowing, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

17.     The Individual Defendants are liable as direct participants in the wrongs alleged herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct alleged.  Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of the Company's business.

18.     The Individual Defendants, because of their positions within the Company, controlled and/or possessed the authority to control the contents of the Company's

5

reports, press releases, and presentations to securities analysts and, through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged to be misleading herein, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

19. The Individual Defendants, as senior executive officers and/or directors – and as controlling persons of a publicly-traded company whose common stock was, and is, governed by the federal securities laws – had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and half-truths during the Class Period violated these specific requirements and obligations.

20. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud and/or deceit on purchasers of the Company's securities by disseminating materially false and misleading statements and/or concealing material adverse facts. This scheme: (1) deceived the investing public regarding the Company's business, operations and management, and the intrinsic value of the Company's securities; (2) enabled the Company to obtain additional capital at favorable prices, create a public market for its securities, and gain

6

access to the public equity markets; and (3) caused Plaintiff and members of the Class to purchase the Company's securities at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

## Background

21.    Inspirato is a small company.  It was incorporated in Delaware on July 31, 2020, as Thayer Ventures Acquisition Corporation ("Thayer"), a special purpose acquisition company formed for the purpose of effecting a merger with one or more operating businesses.  On June 30, 2021, Inspirato LLC entered into a business combination agreement dated June 30, 2021 (as amended September 15, 2021) to become a publicly traded company through a business combination with Thayer.  On February 11, 2022, Thayer and Inspirato LLC consummated the transaction contemplated in the business combination agreement whereby amongst other transactions, a subsidiary of Thayer merged within and into Inspirato LLC with Inspirato LLC as the surviving company, resulting in Inspirato LLC becoming a subsidiary of Thayer.  Thayer changed its name to "Inspirato Incorporated" upon closing of the business combination.  As of June 30, 2022, the Company had only 368 operations employees.

22.    Inspirato is a travel subscription company that claims to provide unique solutions for: (1) affluent travelers seeking superior service and certainty across a wide variety of accommodations and experiences; and (2) hospitality suppliers who want to solve pain points that include monetizing excess inventory and efficiently outsourcing the hassle involved in managing rental properties.

7

23.    The Company claimed to offer travelers access to a diverse portfolio of curated luxury vacation options that, as of December 31, 2022, included 523 private luxury vacation homes available to the Company's subscribers, and accommodations at 350 luxury hotel and resort partners in more than 225 destinations around the world. Inspirato also claimed that its portfolio included: (1) Inspirato Only, featuring one-of-a-kind luxury safaris, cruises, and other experiences; and (2) Bespoke, which offered custom-designed "bucket list" itineraries.  The Company touted that every Inspirato trip came with its personalized service envelope — including pre-trip planning, on-site concierge, and daily housekeeping — designed to meet the needs of affluent travelers.

24.    The Company's portfolio of luxury vacation options was accessed through its subscription platform.  The Company offered three subscriptions: (1) Inspirato Club; (2) Inspirato Pass; and (3) Inspirato Select.

25.    Launched in 2011, Inspirato Club subscribers paid an enrollment fee and monthly or annual subscription for access to the Company's portfolio of branded Inspirato luxury vacation homes, luxury hotels, and five-star resort partners, Inspirato Only experiences, and custom Bespoke itineraries.  In addition to their monthly or annual subscription, subscribers paid members-only nightly rates to book the trips of their choice.  Inspirato Club subscribers could book vacations up to one year in advance.  Inspirato claimed that every Club trip included first-class, personalized service from a team of hospitality experts, including pre-trip planning, on-site concierge, and daily housekeeping.  Inspirato claimed that the Company revenue-managed these rates to achieve occupancy and average daily rate goals while also delivering value to drive subscriber satisfaction.

8

26.     Launched in 2019, Inspirato Pass subscribers paid an enrollment fee and a monthly or annual subscription that was inclusive of nightly rates, taxes, and fees for Pass trips.  Inspirato Pass subscribers booked Pass trips from the Inspirato Pass trip list, which was a constantly updated selection that, as of December 31, 2022, was comprised of more than 2.1 million vacations, ranging from Inspirato residences and hotel partners to custom experiences such as luxury cruises and safaris.  The Company represented that Inspirato Pass subscribers had full access to all the benefits of Inspirato Club, including the ability to pay members-only nightly rates to book trips of their choice, access to the Company's booking promotions, and personalized service on every trip.

27.     Launched in 2022, Inspirato Select subscribers paid an enrollment fee and annual subscription.  The Company claimed that Inspirato Select's hallmark benefit was the ability to book and share Inspirato Select Trips at no additional cost.  Subscribers chose from more than 555,000 trip options, including branded Inspirato luxury vacation homes, luxury hotels, and five-star resorts.  The initial subscription came with three Inspirato Select Trips, and subscribers could then purchase packages of additional trips whenever they chose to do so.  The Company also touted that Inspirato Select provided all the benefits of Inspirato Club, including access to book a la carte travel within Inspirato's exclusive portfolio at members-only nightly rates with five-star personalized service on every trip.  The Company further claimed that Inspirato Select Trips were 100% transferrable and could be shared with others at no additional cost.

28.     The Company represented that all three subscriptions offered travelers: (1) the ability to book trips of their choice within its luxury vacation portfolio up to one

9

year in advance; (2) the purported full Inspirato service experience; and (3) access to Inspirato benefits, such as member events, luxury travel agent services, and partner benefits.  The Company stated that Inspirato Pass subscribers enjoyed the additional benefit of being able to book trips from the Inspirato Pass trip list, which was a constantly updated selection that, as of December 31, 2022, was comprised of approximately 2.1 million vacations.  Additionally, the Company represented that Inspirato Select subscribers were able to book a set number of trips each year from the Inspirato Select trip list, which was a constantly updated selection that, as of December 31, 2022, was comprised of more than 555,000 vacations.

29.     Inspirato also claimed to solve critical pain points for hospitality suppliers, including luxury vacation homeowners seeking to monetize their property with rental income.  For example, because Inspirato Pass did not show nightly rates, the Company touted that it provided an opaque distribution channel through which luxury hotels, resorts, and vacation homeowners could generate revenue from their excess inventory — unoccupied hotel rooms or vacation rentals — without undercutting rates on their own website and other brand assets.  The Company represented that it had arrangements with hotels and resort partners to lease rooms under long-term agreements, providing them with fixed income for excess inventory versus uncertain occupancy-based income.  Inspirato also claimed that it provided luxury vacation homeowners with a simplified, hassle-free ownership experience by providing a fixed monthly lease payment, expert property management services, and flexible usage benefits in exchange for leasing their home for inclusion within the Company's portfolio.

10

30.    In 2021, the Company also launched Inspirato Real Estate as a new consumer-facing brand.  The Company claimed that Inspirato Real Estate offered an easy way to find, buy, own, and enjoy a luxury vacation home.  Inspirato claimed that prospective buyers could explore a vetted collection of properties in dozens of top vacation destinations directly on the Inspirato Real Estate website.  Inspirato represented that once prospective buyers decided where to buy, Inspirato Real Estate's expert team assisted them every step of the way as they selected the perfect vacation home, including connecting them to a local real estate professional.  The Company claimed that prior to closing, customers received a personalized lease overview and financial return profile including a net income projection for their chosen property.  Inspirato also touted that at closing, they leased their new home to Inspirato and enjoyed benefits specifically designed to remove the worry and uncertainty of luxury vacation home ownership.

31.    In the third quarter 2022, the Company developed two new product offerings: Inspirato for Good and Inspirato for Business.  The Company claimed that Inspirato for Good was its turnkey solution for nonprofit fundraising.  Through this platform, the Company represented that it partnered with nonprofit organizations to offer luxury travel packages (consisting of an Inspirato subscription and luxury vacation) at live and silent auctions, paddle raises, and other giving channels.  Additionally, the Company claimed that Inspirato for Business represented a business-to-business channel whereby the Company provided subscription and travel products directly to businesses seeking to provide luxury accommodations and services to their staff and business partners.

11

32.     The Company represented that since its founding, it developed a highly flexible, asset-light approach to controlling and managing its residences.  Inspirato claimed that the central tenet of this approach is that it leased its homes, paying the owners fixed rental income, rather than buying them.  The Company stated that its leases typically permitted it to terminate within one years' notice, giving Inspirato the ability to remove underperforming residences as well as curate the portfolio generally in response to market opportunities and travel demand trends.  Inspirato also represented that many of its leases also had a "force majeure" clause in anticipation of impossible-to-predict disruptive market events, and that during the COVID-19 pandemic, it was able to collaborate with its landlord partners regarding these clauses to purportedly reduce operating costs.  Furthermore, the Company claimed that in addition to traditional leases, it also used other flexible arrangements to secure less than approximately 10% of its residences, including net rate and profit-sharing agreements whereby it paid the property owner based on occupancy and costs instead of fixed monthly payments.

### ASC 842 Lease Accounting Requirements

33.     ASC 842, or Accounting Standards Codification 842, is an accounting standard under Generally Accepted Accounting Principles ("GAAP").  The standard was issued by the Financial Accounting Standards Board ("FASB"), and it impacts lease accounting and reporting.  In February 2016, the FASB issued ASC 842 to require lessees to recognize all leases, with certain exceptions, on the balance sheet. Subsequently, the FASB issued ASU No. 2018-10, Codification Improvements to Topic 842, Leases, ASU No. 2018-11, Targeted Improvements, ASU No. 2018-20, Narrow-Scope Improvements for Lessors, and ASU 2019-01, Codification Improvements, to

clarify and amend the guidance in ASU No. 2016-02. ASC 842 eliminates real estate-specific provisions and modifies certain aspects of lessor accounting. The standard requires that lessees recognize right-of-use assets and lease liabilities on the balance sheet for most leases. This requirement brings greater transparency related to the financial leverage and capital employed by companies.

34.    ASC 842 can be simple to understand, interpret, and apply, particularly for accounting professionals. ASC 842 requires that lessees recognize assets and liabilities on the balance sheet for all leases with terms longer than 12 months. ASC 842 also eliminates the classification of leases as either operating leases or finance leases for lessees. Instead, lessees must recognize a right-of-use asset and a lease liability for virtually all lease contracts. By recognizing essentially all leases on the balance sheet, the standard is intended to provide investors a more accurate picture of a company's leasing activities and obligations. Moreover, because ASC 842 became effective for public companies before it became effective for private companies (like Inspirato at the time), many of the idiosyncrasies of the implementation of the standard became known to accounting professionals at private companies and were manageable.

**Inspirato's Lease Agreements**

35.    Inspirato is a party to operating lease agreements for its vacation homes, hotels, and corporate offices. The Company entered into operating leases primarily for standalone homes, luxury condos, and hotel rooms. Defendants determined whether an arrangement is a lease, or contains a lease, including embedded leases, at inception and recorded the leases in the Company's financial statements. Leases had initial

13

terms of up to 10 years and generally contained extension options at the approval of both parties.

36.     Inspirato claims to have adopted ASC 842 as of January 1, 2022. Additionally, Defendants claim that Inspirato's adoption of the new lease standard on January 1, 2022 had a material impact on the Company's interim condensed consolidated financial statements, and that the most significant impacts related to: (1) the recording of Right of Use ("ROU") assets of $193 million; and (2) recording lease liabilities of $200 million, as of January 1, 2022, on the consolidated balance sheets. ROU assets represent the Company's right to use an underlying asset for the lease term, and lease liabilities represent the Company's obligation to make lease payments arising from the lease.  Inspirato also reclassified prepaid expenses of $1.1 million and deferred rent balances (including tenant improvement allowances and other liability balances) of $7.9 million relating to the Company's existing lease arrangements as of December 31, 2021, into the ROU asset balance as of January 1, 2022.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

37.     On May 12, 2022, the Company filed its Form 8-K for first quarter period ended March 31, 2022, with press release attached, signed by CFO Neighbor. The Form 8-K stated, in pertinent part, as follows:

Item 2.02 Results of Operations and Financial Condition

On May 11, 2022, Inspirato Incorporated ("Inspirato" or the "Company") issued a press release announcing its financial results for the quarter ended March 31, 2022. A copy of the press release is furnished as Exhibit 99.1 to this current report on Form 8 K and is incorporated by reference herein…

The May 11, 2022 Press Release stated, in pertinent part, as follows:

2022 First Quarter Highlights:

14

● Record Setting Operational Results. As of March 31, 2022, Total Active Subscriptions, Annual Recurring Revenue, Total Nights Delivered and Controlled Accommodations all finished at the highest levels in Company history.

● Record Subscription Revenue, Travel Revenue, and Total Revenue. Record quarterly revenue of $82 million, an increase of 67% year-over-year, including quarterly records of $32 million of subscription revenue and $50 million of travel revenue, up 50% and 79% year-over-year, respectively…

Business and Financial Highlights

Total revenue for the quarter was $82 million, a 67% increase year-over-year and 20% increase compared to the fourth quarter of 2021. Increased revenue was driven by strong growth in both subscription and travel revenue as the Company continues to benefit from its innovative subscription model and robust travel demand…

Net loss for the first quarter of 2022 was $24 million compared to a net loss of $3.5 million in the first quarter of 2021. The difference in net loss between periods was due to increased gross margin being offset by increased corporate operating expenses and warrant fair value losses between periods. Adjusted Net Loss, a non-GAAP measure defined below, was $6.1 million for the first quarter of 2022 compared to $3.5 million in the comparable 2021 period. The difference in Adjusted Net Loss between periods is due to changes in the fair value of warrants. Adjusted EBITDA loss, a non-GAAP measure defined below, was approximately $3.5 million in the first quarter of 2022 compared to approximately $1.6 million in the first quarter of 2021. The difference in Adjusted EBITDA loss between periods was due to increased gross margin being offset by increased corporate operating expenses and warrant fair value losses between periods…

2022 Guidance

The Company expects its full-year 2022 revenue to be in a range of $350 million to $360 million. In addition, the Company expects its full-year Adjusted EBITDA loss to be in the range of $15 million to $25 million…

Reconciliation of Non- GAAP Financial Measures In addition to our results determined in accordance with GAAP, we use Adjusted Net Loss, Adjusted EBITDA, Adjusted EBITDA Margin and Free Cash Flow as part of our overall assessment of our performance, including the preparation of our annual operating budget and quarterly forecasts, to evaluate the effectiveness of our business strategies and to communicate with our board of directors concerning our business and financial performance. We believe that these non-GAAP financial measures provide useful information to investors about our business and financial performance, enhance their overall understanding of our past performance and future prospects, and allow for greater transparency with respect to metrics used by our management in their

financial and operational decision making. We are presenting these non-GAAP financial measures to assist investors in seeing our business and financial performance through the eyes of management, and because we believe that these non GAAP financial measures provide an additional tool for investors to use in comparing results of operations of our business over multiple periods with other companies in our industry…

38.     On May 13, 2022, the Company filed its Form 10-Q with the SEC for the quarterly period ended March 31, 2022, signed by CEO Handler and CFO Neighbor. Attached to the Form 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Handler and Neighbor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.   The Form 10-Q provided, in pertinent part, as follows:

…Significant Accounting Policies

(a) Basis of Presentation

The accompanying unaudited condensed consolidated financial statements included herein have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") and applicable rules and regulations of the U.S. Securities and Exchange Commission (the "SEC") regarding interim financial reporting. Certain information and disclosures normally included in the financial statements prepared in accordance with GAAP have been condensed or omitted pursuant to such rules and regulations. These unaudited condensed consolidated financial statements should be read together with the Company's audited consolidated financial statements and accompanying notes as of and for the years ended December 31, 2021 and for the period from July 31, 2020 (inception) through December 31, 2020 and Inspirato LLC's audited consolidated financial statements and accompanying notes for the years ended December 31, 2020 and 2021 included in the final prospectus statement dated March 10, 2022 with the SEC pursuant to Rule 424(b)(3) under the Securities Act.

In management's opinion, these unaudited condensed consolidated financial statements have been prepared on the same basis as the audited annual financial statements and reflect all adjustments, which include normal recurring adjustments, necessary for the fair statement of the Company's financial position as of March 31, 2022 and the results of

16

operations for the three months ended March 31, 2022. The results of operations for the three months ended March 31, 2022 are not necessarily indicative of the results to be expected for the full year ending December 31, 2022 or any other future interim or annual period.

For the three months ended March 31, 2021, these unaudited condensed consolidated financial statements present the consolidated results of operations, comprehensive income (loss), cash flows and changes in equity of Inspirato LLC. The condensed consolidated balance sheet as of December 31, 2021 presents the financial condition of Inspirato LLC and its wholly-owned subsidiaries…

(d) Leases

The Company is party to operating lease agreements for its vacation homes, hotels and corporate offices. In February 2016, the FASB issued ASU No. 2016 02 ("ASC 842"), Leases, to require lessees to recognize all leases, with certain exceptions, on the balance sheet, while recognition on the statement of operations remains similar to legacy lease accounting. Subsequently, the FASB issued ASU No. 2018-10, Codification Improvements to Topic 842, Leases, ASU No. 2018 11, Targeted Improvements, ASU No. 2018-20, Narrow-Scope Improvements for Lessors, and ASU 2019-01, Codification Improvements, to clarify and amend the guidance in ASU No. 2016-02. ASC 842 eliminates real estate-specific provisions and modifies certain aspects of lessor accounting. The Company adopted ASC 842 as of January 1, 2022 using the modified retrospective approach ("adoption of the new lease standard"). This approach allows entities to either apply the new lease standard to the beginning of the earliest period presented or only to the consolidated financial statements in the period of adoption without restating prior periods. The Company has elected to apply the new guidance at the date of adoption without restating prior periods. In addition, the Company elected the package of practical expedients permitted under the transition guidance within the new standard, which allowed the Company to carry forward the historical determination of contracts as leases and lease classification and not reassess initial direct costs for historical lease arrangements. We also elected the practical expedient to not separate lease and non-lease components for all of our current classes of leases. Operating lease assets are included within operating lease right of use ("ROU") assets. The corresponding operating lease liabilities are included within other current liabilities and other long-term liabilities on the Company's condensed consolidated balance sheet as of March 31, 2022. The Company has elected not to present short-term leases on the consolidated balance sheet as these leases have a lease term of 12 months or less at lease inception and do not contain purchase options or renewal terms that the Company is reasonably certain to exercise. All

other lease assets and lease liabilities are recognized based on the present value of lease payments over the lease term at the later of ASC 842 adoption date or lease commencement date. Because most of the Company's leases do not provide an implicit rate of return, the Company used the Company's incremental borrowing rate based on the information available at adoption date or lease commencement date in determining the present value of lease payments. Adoption of the new lease standard on January 1, 2022 had a material impact on the Company's interim condensed consolidated financial statements. The most significant impacts related to the (i) recording of ROU assets of $193 million, and (ii) recording lease liabilities of $200 million, as of January 1, 2022 on the consolidated balance sheets. The Company also reclassified prepaid expenses of $1.1 million and deferred rent balances (including tenant improvement allowances and other liability balances) of $7.9 million relating to the Company's existing lease arrangements as of December 31, 2021, into the ROU asset balance as of January 1, 2022. ROU assets represent the Company's right to use an underlying asset for the lease term and lease liabilities represent the Company's obligation to make lease payments arising from the lease. The standard did not materially impact the Company's consolidated statement of operations and consolidated statement of cash flows and has had no impact on our debt covenants.

The cumulative effect of the changes made to the Company's consolidated balance sheet as of January 1, 2022 for the adoption of the new lease standard was as follows (in thousands):
…Liabilities
Current lease liability $ — $ 59,933 $ 59,933
Other current liabilities 457 (457) —
Long-term lease liability — 140,230 140,230
Other long-term liabilities 7,468 (7,468)…

Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations.

…Cost of revenue
Cost of revenue increased 46% from $32 million for the three months ended March 31, 2021 to $47 million for the three months ended March 31, 2022. This increase was primarily a result of higher direct travel costs resulting from increased travel as a result of higher travel demand and loosened travel restrictions. Lease payments on properties we lease also increased year over year due to new properties onboarded during the year. Our gross margin increased from 35% for the three months ended March 31, 2021 to 43% for the three months ended March 31, 2022 due largely to an increase in subscriber base and a loosening of travel restrictions allowing for an increased volume of nightly travel stays

18

Item 4. Controls and Procedures.

Evaluation of Disclosure Controls and Procedures

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated, as of the end of the period covered by this Quarterly Report on Form 10-Q, the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d15(e) under the Securities Exchange Act of 1934, as amended, or the Exchange Act). Based on that evaluation, and as a result of the material weaknesses in internal control over financial reporting described below, our Chief Executive Officer and Chief Financial Officer concluded that, as of March 31, 2022, our disclosure controls and procedures were not effective at the reasonable assurance level. In light of this fact, our management has performed additional analyses, reconciliations, and other post-closing procedures and has concluded that, notwithstanding the material weaknesses in our internal control over financial reporting, the unaudited condensed consolidated financial statements for the periods covered by and included in this Quarterly Report on Form 10-Q fairly state, in all material respects, our financial position, results of operations and cash flows for the periods presented in conformity with GAAP.

Material Weaknesses in Internal Control over Financial Reporting

…As disclosed in the section titled "Risk Factors" in Part II, Item 1A and as of the end of the period covered by this Quarterly Report on Form 10-Q, our control deficiencies are as follows:

● We have lacked a sufficient number of personnel with the appropriate level of knowledge and experience in the application of GAAP, including the application of new accounting standards, and in the design and implementation of internal controls and have not had the necessary business processes and related internal controls. Additionally, we did not design and maintain effective controls over our financial closing and reporting processes.

● We did not design and maintain effective controls relevant to the preparation of our financial statements with respect to information technology general controls ("ITGCs"). Specifically, the material weaknesses relating to ITGCs are due to a lack of the design and implementation of certain ITGCs related to our financial applications and data being adequately restricted.

Remediation Plan

19

We have made significant progress toward remediation of these control deficiencies described above. We hired a number of key appropriately qualified personnel with the appropriate level of knowledge and experience in the application of GAAP, including three Certified Public Accountants since this material weakness was initially identified in 2021. We have engaged third party consultants to assist with the design and implementation of ITGCs, more specifically designing additional change management and access controls for our relevant IT applications to further restrict privileged access and implementing controls to review activities, which may materially affect our financial statements, for those users who have privileged access…

Changes in Internal Control Over Financial Reporting

Other than the material weakness remediation efforts underway, there were no changes in our internal control over financial reporting identified in connection with the evaluation required by Rule 13a-15(d) and 15d-15(d) of the Exchange Act that occurred during the quarter ended March 31, 2022, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting…

39.     On August 8, 2022, the Company filed its Form 8-K with the SEC signed by CFO Neighbor, attaching a Press Release dated August 8, 2022. The Form 8-K stated, in pertinent part, as follows:

…Record Setting Operational Results.

As of June 30, 2022, Total Active Subscriptions, Annual Recurring Revenue and Controlled Accommodations all finished at the highest levels in Company history. Record Subscription Revenue and Total Revenue. Record quarterly revenue of $84 million, an increase of 60% year-over-year, including record subscription revenue of $36 million, an increase of 50% year-over-year… Annual Recurring Revenue increased more than 50% year-over-year to a record $157 million…

2022 Guidance and 2023 Outlook

Anticipated 2022 total revenue between $350 million to $360 million, a year-over year increase of approximately 50%...

Management Commentary

"Our results in the second quarter demonstrated the many ways Inspirato offers incredible value to its subscribers, commented Co-Founder and Chief Executive Officer Brent Handler. Despite the macro uncertainty in the current

20

environment, we continue to set records from both a new supply and travel demand standpoint that have us positioned to meet our full-year revenue guidance of $350 to $360 million. As we shift our focus to the back half of the year and 2023, the emphasis is on quickly and efficiently returning to generating sustained profitability….
Business and Financial Highlights

… Net loss for the second quarter of 2022 was $7.2 million compared to a net loss of $0.6 million in the second quarter of 2021. The difference in net loss between periods was due to increased gross margin being offset by increased corporate operating expenses. Adjusted Net Loss, a non-GAAP measure defined below, was $18 million for the second quarter of 2022 compared to an Adjusted Net Loss of $10 million in the comparable 2021 period. The primary difference in Adjusted Net Loss between periods was due to increased sales and marketing and operations expense partially offset by increased gross margin…

Reconciliation of Non- GAAP Financial Measures

In addition to our results determined in accordance with GAAP, we use Adjusted Net Loss, Adjusted EBITDA, Adjusted EBITDA Margin and Free Cash Flow as part of our overall assessment of our performance, including the preparation of our annual operating budget and quarterly forecasts, to evaluate the effectiveness of our business strategies and to communicate with our board of directors concerning our business and financial performance. We believe that these non-GAAP financial measures provide useful information to investors about our business and financial performance, enhance their overall understanding of our past performance and future prospects, and allow for greater transparency with respect to metrics used by our management in their financial and operational decision making. We are presenting these non-GAAP financial measures to assist investors in seeing our business and financial performance through the eyes of management, and because we believe that these non-GAAP financial measures provide an additional tool for investors to use in comparing results of operations of our business over multiple periods with other companies in our industry...

40.    On August 10, 2022, the Company filed its Form 10-Q quarterly report for the period ended June 30, 2022 with the SEC, signed by CEO Handler and CFO Neighbor. Attached to the Form 10-Q were certifications pursuant to SOX signed by CEO Handler and CFO Neighbor attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial

21

reporting, and the disclosure of all fraud. The Form 10-Q provided, in pertinent part, as

follows:

… Significant Accounting Policies

(a) Basis of Presentation

The accompanying unaudited condensed consolidated financial statements included herein have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") and applicable rules and regulations of the U.S. Securities and Exchange Commission (the "SEC") regarding interim financial reporting. Certain information and disclosures normally included in the financial statements prepared in accordance with GAAP have been condensed or omitted pursuant to such rules and regulations. These unaudited condensed consolidated financial statements should be read together with the Company's audited consolidated financial statements and accompanying notes as of and for the years ended December 31, 2021 and for the period from July 31, 2020 (inception) through December 31, 2020 and Inspirato LLC's audited consolidated financial statements and accompanying notes for the years ended December 31, 2020 and 2021 included in the final prospectus statement dated March 10, 2022 filed with the SEC pursuant to Rule 424(b)(3) under the Securities Act.

In management's opinion, these unaudited condensed consolidated financial statements have been prepared on the same basis as the audited annual financial statements and reflect all adjustments, which include normal recurring adjustments, necessary for the fair statement of the Company's financial position as of June 30, 2022 and the results of operations for the three and six months ended June 30, 2022. The results of operations for the three and six months ended June 30, 2022 are not necessarily indicative of the results to be expected for the full year ending December 31, 2022 or any other future interim or annual period.

For the three and six months ended June 30, 2021, these unaudited condensed consolidated financial statements present the consolidated results of operations, comprehensive income (loss), cash flows and changes in equity of Inspirato LLC. The condensed consolidated balance sheet as of December 31, 2021 presents the financial condition of Inspirato LLC and its wholly-owned subsidiaries…

Critical Accounting Policies and Estimates

22

The discussion and analysis of our financial condition and results of operations are based upon our condensed consolidated financial statements, which have been prepared in accordance with GAAP…

Except for the policies described in "Note 2—Significant Accounting Policies" to our condensed consolidated financial statements included elsewhere in this Quarterly Report on Form 10-Q, including the accounting policy for leases as a result of the Company adopting the Financial Accounting Standards Board's (FASB) Accounting Standards Update (ASU) Leases (Topic 842) on January 1, 2022, there have been no significant changes from the significant accounting policies disclosed in Note 2 of the "Notes to Consolidated Financial Statements" of the audited consolidated financial statements for the year ended December 31, 2021, which are included in our prospectus filed pursuant to Rule 424(b)(3) on May 9, 2022. For more information, please refer to "Note 2—Summary of Significant Accounting Policies" to our unaudited condensed consolidated financial statements included in Part I, Item 1 of this Quarterly Report on Form 10-Q…

Item 4. Controls and Procedures

Evaluation of Disclosure Controls and Procedures

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated, as of the end of the period covered by this Quarterly Report on Form 10-Q, the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d15(e) under the Securities Exchange Act of 1934, as amended, or the Exchange Act). Based on that evaluation, and as a result of the material weaknesses in internal control over financial reporting described below, our Chief Executive Officer and Chief Financial Officer concluded that, as of June 30, 2022, our disclosure controls and procedures were not effective at the reasonable assurance level. In light of this fact, our management has performed additional analyses, reconciliations, and other post-closing procedures and has concluded that, notwithstanding the material weaknesses in our internal control over financial reporting, the unaudited condensed consolidated financial statements for the periods covered by and included in this Quarterly Report on Form 10-Q fairly state, in all material respects, our financial position, results of operations and cash flows for the periods presented in conformity with GAAP.

Material Weaknesses in Internal Control over Financial Reporting

…As disclosed in the section titled "Risk Factors" in Part II, Item 1A and as of the end of the period covered by this Quarterly Report on Form 10-Q, our control deficiencies are as follows:

● We have lacked a sufficient number of personnel with the appropriate level of knowledge and experience in the application of GAAP, including the application of new accounting standards, and in the design and implementation of internal controls and have not had the necessary business processes and related internal controls. Additionally, we did not design and maintain effective controls over our financial closing and reporting processes.

● We did not design and maintain effective controls relevant to the preparation of our financial statements with respect to information technology general controls ("ITGCs"). Specifically, the material weaknesses relating to ITGCs are due to a lack of the design and implementation of certain ITGCs related to our financial applications and data being adequately restricted.

Remediation Plan

We have made progress toward remediation of these control deficiencies described above. We hired a number of key appropriately qualified personnel with the appropriate level of knowledge and experience in the application of GAAP since this material weakness was initially identified in 2021 and we continue to recruit qualified personnel. We have engaged third party consultants to assist with the design and implementation of ITGCs, more specifically designing additional change management and access controls for our relevant IT applications to further restrict privileged access and implementing controls to review activities, which may materially affect our financial statements, for those users who have privileged access. While we believe these efforts will remediate the material weaknesses, these material weaknesses cannot be considered fully remediated until the applicable remedial controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively.

Changes in Internal Control Over Financial Reporting

Other than the material weakness remediation efforts underway, there were no changes in our internal control over financial reporting identified in connection with the evaluation required by Rule 13a-15(d) and 15d-15(d) of the Exchange Act that occurred during the quarter ended June 30, 2022, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting…

41.    Also on August 10, 2022, CEO Handler sold 15,779 shares of the

Company's stock at $3.91 per share for proceeds of $61,695.89.  The same day, CEO

24

Handler sold another 100 shares of the Company's stock at $4.90 per share for proceeds of $490.

42.    Additionally, on August 16, 2022, CEO Handler sold another 73,466 shares of the Company's stock at $3.48 per share for proceeds of $255,661.68.

43.    The statements contained in ¶¶37-40 were materially false and misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's unaudited condensed consolidated financial statements as of and for the quarterly periods ended March 31, 2022 and June 30, 2022 (collectively, the 'Non-Reliance Periods') included in the Quarterly Reports on Form 10-Q filed with the SEC for the Non-Reliance Periods, could no longer be relied upon; (2) the Quarterly Reports could no longer be relied upon due to the incorrect application of ASC 842 with respect to the assessment of right-of-use assets and liabilities, resulting in an understatement of both right-of-use assets and total lease liabilities of approximately 9% for each of the Non-Reliance Periods resulting in an understatement of total assets and total liabilities by approximately 5% for each of the Non-Reliance periods, and due to property-related and other expenses being under accrued in the first quarter, and over accrued in the second quarter, resulting in cost of revenue being understated by approximately 1% and overstated by approximately 5% in the first and second quarter, respectively (similarly, any previously issued or filed reports, press releases, earnings releases, and investor presentations or other communications describing the Company's condensed

25

consolidated unaudited financial statements and other related financial information covering the Non-Reliance Periods should no longer be relied upon); (3) the Company was not in compliance with the periodic filing requirements for continued listing set forth in Nasdaq Listing Rule 5250(c)(1) as a result of its failure to file its Quarterly Report on Form 10-Q for the quarter ended September 30, 2022 (the "Third Quarter Report") with the SEC by the required due date; and (4) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## DEFENDANTS ACTED WITH SCIENTER

44. During the Class Period, Defendants had both the motive and opportunity to commit fraud. Defendants also had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time. Thus, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period. The following information is a non-exclusive listing of examples of facts demonstrating Defendants' scienter during the Class Period.

### CEO Handler's Suspiciously Timed Stock Sales
### Support a Strong Inference of Scienter

45. As a result of the above false and misleading statements, the Company's share price was artificially inflated. While in possession of material, non-public information, CEO Handler capitalized on the artificially inflated stock price by selling the Company's securities during the Class Period.

26

46.    Indeed, between August 10 and August 16, 2022, CEO Handler sold 89,345 shares of the Company's stock for proceeds of $317,847.57, while the price of the Company's stock was artificially inflated.  These proceeds constituted substantially more than what CEO Handler would have earned had investors known the truth about Inspirato's business operations.  Specifically, on August 10, 2022, CEO Handler sold 15,779 shares of the Company's stock at $3.91 per share for proceeds of $61,695.89. The same day, CEO Handler sold another 100 shares of the Company's stock at $4.90 per share for proceeds of $490.  Additionally, on August 16, 2022, CEO Handler sold another 73,466 shares of the Company's stock at $3.48 per share for proceeds of $255,661.68.

47.    The shares sold by CEO Handler were highly suspicious in both amount (based on the sheer dollar value of shares sold) and timing (made during a time period where Defendants were making materially false statements to investors and/or failing to disclose material information that they had a duty to disclose).  For instance, on August 8, 2022 – two days before CEO Handler sold 15,879 shares of the Company's stock for proceeds of $62,195.89 – Defendants claimed, among other things, that Inspirato had achieved "record setting operational results" and that the Company's financial results were determined to be "in accordance with GAAP."  Also, on August 10, 2022 – the same day on which CEO Handler and CFO Neighbor attested to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud – CEO Handler sold 15,879 shares of the Company's stock for proceeds of $62,195.89.

27

**The CW Accounts Support a Strong Inference of Scienter**

48.     The CW accounts also demonstrate that Defendants acted with scienter when they made their false and misleading statements.   For instance, Confidential Witness ("CW") 1 worked at Inspirato from October 2019 to October 2021, serving as both an Accounting Manager and as a Senior Accounting Manager.   CW1 stated that one of the biggest problems at the Company was that it built an internal technology without the assistance of anyone in finance or accounting.   According to CW1, the Company's accounting was materially incorrect for many years.   CW1 stated that CEO Handler did not get along with anyone in leadership of the Company's accounting or finance departments.

49.     CW1 stated that CEO Handler believed that he did not have to comply with GAAP and that as a result, CEO Handler cut corners to get around GAAP compliance and was very comfortable defrauding people through the Company's financial statements.   CW1 explained that CEO Handler constantly sought ways to be "creative" with the Company's accounting.   CW1 stated that CEO Handler made the Company's accountants post journal entries into the Company's financial statements so they looked the way he wanted, not how GAAP required.   According to CW1, the Company called them "management financials."

50.     For example, CW1 stated if a new club member had to pay a $20,000 initiation fee, GAAP required it to be recognized over a year.   According to CW1, however, CEO Handler demanded that the Company recognize all the revenue immediately although his demand did not comply with GAAP.   CW1 also stated that with

28

respect to the finance reporting that CW1 observed, the Company's finance team manipulated numbers for CEO Handler.

51.     CW1 also stated that the Company did not have a history of valuing accounting personnel.  CW1 stated that CW1 was hired to implement ASC 606, which CW1 described as a significant change in how companies were able to recognize revenue.  Through this work, CW1 was able to discover issues with the Company's system of record and the platform that the Company created.  According to CW1, this platform and any sort of transactions were supposed to operate in conjunction with the billing platform called Zuora.  CW1 stated, however, that Zuora was implemented by someone in the Company's product department rather than someone in the accounting or finance department.

52.     CW1 also stated that the Company invented its own currency call "travel perks."  According to CW1, the Company compensated certain customers who made complaints with denominations of travel perks (for instance, 1000 travel perks for a property that was not properly cleaned).  The customer could then use those travel perks to pay for trips.  According to CW1, however, those travel perks were not cash, but the Company was improperly recognizing them as revenue, which CW1 described as fraud.  CW1 stated that although the Company attempted to fix the issue before the 2020 audit, the root problem was that the Company was not willing to hire people with adequate accounting or finance knowledge.  CW1 also stated that the Company did not have appropriate safeguards for internal controls and processes.  According to CW1, the Company's executives were not using any system controls and did not even know

29

the purpose of such controls.  CW1 stated further that the Company did not possess people with experience to determine if particular journal entries were right or wrong.

53.    CW1 also stated that in CW1's work on ASC 606, there were some provisions of ASC 606 that affected ASC 842.   CW1 stated that ASC 606 has rules on how to estimate components of a lease.  CW1 stated that as an example, a free trip might be offered to a leasing agent as a commission, and that ASC 606 governs the valuation of such items, which is inputted into ASC 842.  According to CW1, the personnel at the Company handling the work on ASC 842 did not have the background and experience to properly perform the work.  CW1 also stated that the Company received $9 million in a COVID grant, conducted a huge layoff, reduced salaries by 20%, collected the money, got it all forgiven, and paid it all out in executive bonuses for the Company's executives.

54.    Additionally, CW2 served at Inspirato from September 2018 to January 2023.  CW2 served as an IT Manager from September 2018 to January 2022, and as an IT and Security Project Manager from November 2021 to January 2023.  CW2 managed the Company's compliance efforts.  In that capacity, CW2 worked with outside vendors to determine what the Company needed to do to become complaint, and how to implement the process in-house.

55.    CW2 began at Inspirato handling all the Company's budgets for its IT department and the software for the entire Company.  CW2 discovered that during an initial assessment in approximately 2020, Inspirato had systems that the Company did not properly identify as part of its record-keeping process.  CW2 stated that the Company failed to remedy these determinations, and that no internal controls were

implemented to address the findings from the prior assessment. CW2 also found that Inspirato had no checks and balances in place to verify manual entries that were made in the Company's financial reporting systems – a process the Company called "segregation of duties." CW2 stated that with the Company's financial reporting, there were a lot of manual entries made and no checks and balances on these processes. CW2 stated that Inspirato's personnel did not know how the Company's systems were built or how to change the systems.

56.    In 2022, CW2 began working with CFO Neighbor. CW2 stated that CFO Neighbor attended meetings in which the participants included various financial teams and owners of apps. CW2 stated that CFO Neighbor specifically attended meetings involving the Company's financial department and was extremely involved in meetings and issues that involved financial issues. CW2 stated further that CEO Handler did not take the Company's internal control issues seriously. CW2 stressed that Inspirato's executives did not prioritize the Company's internal controls, nor did they prioritize having sufficient qualified personnel to handle the Company's accounting issues.

57.    CW2 also stated that one of the most challenging teams was Inspirato's finance team because the Company's finance personnel did not properly perform their work. For example, CW2 indicated that at the beginning of 2022, CW2 requested user access review information from the Company's finance department. CW2 stated that CW2 did not receive any of the requested information until near the end of the year. CW2 stated further that there were several additional categories of internal controls issues that existed at Inspirato during CW2's tenure, including, but not limited to, user access/segregation of duties and financial reporting.

31

58.     CW3 worked at Inspirato between March 2016 to November 2022 in various positions, including: Manager, Brand Strategy and Content; Senior Manager, Brand Strategy; Director, Corporate Strategy; and Director, Strategy and Operations. CW3's role was working very closely with CEO Handler on new product initiatives or interacting with different departments on new products.  CW3 worked closely with CEO Handler since 2019 and would spend at least an hour a day speaking with CEO Handler during the time that CW3 reported to CEO Handler.  CW3 also worked closely with CFO Neighbor.

59.     CW3 stated that based upon CW3's experience with CEO Handler, CEO Handler would embellish information related to specific data.  For instance, CW3 stated that in the course building pitch materials, CEO Handler would pick out information that made things sound as good as possible without providing a complete picture of the information.    CW3 stated further that attorneys would have to correct the embellishments that CEO Handler attempted to portray.  Additionally, CW3 stated that CEO Handler was not interested in information that was not favorable to the Company.

60.     CW3 stated further that most of the Company's executive team was working outside of their fields of background.  For instance, CW3 stated that the head of care worked in marketing, the head of marketing was an attorney, and the head of technology and product was a general consultant.  As a result, according to CW3, Inspirato's executive team did not have extensive experience in the fields they were managing.

61.     Additionally, CW3 said that the Company was chaotic and mismanaged. CW3 indicated that Inspirato's management team changed many times and that there

was a rotating door of CFOs.  CW3 stated that the Company's accounting "was always an afterthought.  Always, always, always."  CW3 explained that these circumstances contributed to the decision of former CFO Michelle Shewchuk to quit.  CW3 said that the subsequent CFO, Mark Hays, was terminated because of a lack of experience in taking a company public.  CW3 stated further that the Company was reckless with money, and that Inspirato devoted resources to new products that CEO Handler envisioned without testing the product.  CW3 also stated that there was no real C-suite at the Company (just the CEO and CFO) and that, as a result, there was no accountability in the executive team.

62.    CW3 also said that CEO Handler was accustomed to skirting around the truth and inflating numbers.  For instance, CW3 stated that this became an issue when the Company started working with the SPAC.  CW3 was responsible for the pitch deck, working with CEO Handler and CFO Neighbor.  According to CW3, the Company's legal department found statements that CEO Handler would make or would propose to make that the legal department prohibited CEO Handler from making.

63.    CW4 worked at Inspirato from October 2020 to January 2023 as a Senior Financial Analyst.  CW4 was focused primarily on modelling Inspirato's subscription revenue.  CW4 reported to Andy Dutton, who serves as the Company's as Senior Vice President of Finance and Portfolio Management.  As a Senior Financial Analyst, CW4 interfaced with company executives and attended meetings with company executives weekly or several times a week – meetings that included the CEO and CFO.  During the meetings, participants would review the Company's financials, present forecasts, and discuss operational metrics, both back-end and forward-looking.  CW4 stated that CEO

33

Handler exclaimed at the end of one meeting "God, I was not meant to run a company this big."

64.    CW5 worked at Inspirato from August 2020 to September 2023 in various capacities, including GL Accountant, Property Accountant, and Senior Property Accountant.    CW5 worked specifically on issues related to the Company's implementation of ASC 842.

65.    CW5 stated that when CW5 began at the Company in 2020, Inspirato did not have a CFO.  Instead, the Company had a Director of Accounting, who was not a Certified Public Accountant and was not well qualified.

66.    CW5 stated that once the Company adopted ASC 842, CW5 performed all of the Company's lease accounting.  CW5 was hired as a staff accountant, but was informed upon starting that the Company had over 500 leases and that CW5 would oversee the Company's leases.

67.    CW5 also said that an Enterprise Resource Planning ("ERP") system was supposed to calculate the Company's lease accounting in accordance with ASC 842. However, CW5 stated that Defendants never properly set up the system.  CW5 said that once the ERP system was initiated, it malfunctioned and wreaked havoc on Inspirato's software system.  CW5 explained that Inspirato never had one single lease.  Instead, the Company had unusual stipulations and agreements contained in each lease.  As a result, CW5 stated that the Company's lease accounting had to be performed manually.

68.    Additionally, CW5 stated that the Company was failing to book deferred rent because of this manual process.  CW5 said that the Company's leases still had to be paid (and, thus, cash and expenses were going out each month), but that the

34

Company could not book those items accordingly until a manual process was performed for the lease accounting to revert back to ASC 840, the applicable standard before ASC 842 was implemented. As a result, Inspirato booked deferred rent at the end of 2021, but, according to CW5, Defendants should have been booking deferred rent monthly.

69.    Additionally, CW5 stated that for an entire year, CW5 never had a manager. CW5 said that only CW5 and another senior accountant handled all of the Company's leases – more than 500 of them. CW5 stated that Phil Yoo, the Company's Controller, was the first to realize there was a massive problem with the Company's lease accounting, but he quickly resigned.

70.    CW5 then had multiple telephone calls with CFO Neighbor in which CW5 stated to Neighbor that the Company lacked internal controls, review processes, and managers. CW5 also informed CFO Neighbor during these telephone calls that the accounting personnel would perform a month-end close and book journal entries and no one ever looked at them. According to CW5 – and as CW1 indicated – the accounting personnel could have posted whatever numbers they wanted and no one would ever know if they were right or wrong. CW5 also stated that CW5 sent a very lengthy email in the beginning of 2021 expressing these concerns to CFO Neighbor. CW5 stated that CFO Neighbor claimed he would look into fixing the issues.

71.    CW5 also had conversations with CFO Neighbor regarding the misapplication of ASC 842, including at the time CW5 started at the Company. CW5 stated that it was a nightmare that landed on CW5's plate, and that, as a result, CW5 was very open about the issue and would speak to anyone who would listen. CW5 also recalls that in the fall of 2022 – around the time that Phil Yoo resigned – the Company

35

held a large meeting with all managers, account executives, and everyone involved in lease accounting during which this issue was discussed.  CW5 stated that the participants acknowledged that the issue with lease accounting was a "big issue, and it's wrong."  CW5 stated that CFO Neighbor was a participant during this meeting.

### Defendants' Access to Information and Hands-On Management Style Supports a Strong Inference of Scienter

72.    Defendants' access to information and the hands-on management style of CEO Handler and CFO Neighbor further support a strong inference of scienter.  For instance, CW2 stated that CFO Neighbor attended meetings in which the participants included various financial teams and owners of apps.  CW2 stated that CFO Neighbor specifically attended meetings involving the Company's financial department and was extremely involved in meetings and issues that involved financial issues.  Additionally, CW6 served as the Vice President of Revenue Management and Channel Distribution at the Company from December 2021 to April 2023.  CW6 had regular meetings with CEO Handler and CFO Neighbor.  CW6 stated that Inspirato's CEO and CFO were micromanagers and very directive.  CW6 stated that CW6 would have preferred more autonomy, but CEO Handler and CFO Neighbor were "engaged" and had a lot of strong opinions, with no real data.  CW7 also corroborated the accounts of CW2 and CW6. CW7 served as the Vice President of IT at Inspirato from August 2014 to July 2023. CW7 also described CEO Handler as "hands-on."

### The Core Operations Inference Supports a Strong Inference of Scienter

73.    The facts alleged also support a strong inference of scienter because they relate to the core operations of the Company.  Indeed, Inspirato leases most of its

36

properties, and the Company's obligations to landlords under these lease agreements extend for periods that often significantly exceed the duration of customers' subscriptions, often by many years.

74.     Additionally, the Company's cost of revenue includes costs directly related to delivering travel to its subscribers and guests, as well as depreciation and amortization related to leasehold improvements and equipment at residences. These costs include payments for properties that the Company leases, operating and maintenance costs of those properties (including on-site service personnel costs), as well as costs paid to Inspirato's hotel partners for subscriber stays.

75.     Inspirato, moreover, is a small company, which bolsters the inference of scienter created through the core operations inference.  Indeed, as of June 30, 2022, the Company had only 368 operations employees.

**Inspirato's Substantial Remedial Actions Support a Strong Inference of Scienter**

76.     The substantial remedial actions implemented by the Company further support a strong inference of scienter.  Specifically, on November 14, 2022, the Company announced the following:

> In connection with the restatements discussed above, the Company's management has re-evaluated the effectiveness of the Company's disclosure controls and procedures as of March 31, 2022 and June 30, 2022 and based on that evaluation, the Company's management has concluded its disclosure controls and procedures remained ineffective due to the unremediated material weaknesses previously disclosed in Item 4 "Controls and Procedures" in the Company's Quarterly Reports on Form 10-Q filed with the SEC for the Non-Reliance Periods. Management is developing a remediation plan for the material weaknesses.

77.     Moreover, during the Company's earnings call on December 20, 2022, CFO Neighbor stated that Inspirato added staff and implemented measures "for the first

time ever" ahead of an internal audit "tasked with delivering on the type of control environment that [one] would expect with a public company of our like kind of character." These remedial measures add to the strong inference of scienter alleged because, as alleged more fully herein, they followed the Company's systemic and reckless disregard of Inspirato's internal financial controls.

## The Simplicity of the Applicable Accounting Principles Supports a Strong Inference of Scienter

78.    The simplicity of the relevant accounting standards also bolsters the strong inference of scienter alleged.  Specifically, ASC 842 can be simple to understand, interpret, and apply, particularly for accounting professionals.  ASC 842 requires that lessees recognize assets and liabilities on the balance sheet for all leases with terms longer than 12 months.  ASC 842 also eliminates the classification of leases as either operating leases or finance leases for lessees.  Instead, lessees must recognize a right-of-use asset and a lease liability for virtually all lease contracts. Moreover, because ASC 842 became effective for public companies before it became effective for private companies (like Inspirato at the time), many of the idiosyncrasies of the implementation of the standard became known to accounting professionals at private companies and were manageable.

## CFO Neighbor's Secret Termination Adds to the Strong Inference of Scienter Alleged

79.    CFO Neighbor's secret termination from the Company – which Inspirato failed to disclose to investors at the time the termination occurred – also adds to the strong inference of scienter alleged.  On March 15, 2023, the Company filed a Form 8-K with the SEC announcing CFO Neighbor's termination as CFO and transition to Chief

38

Strategy Officer. Specifically, Inspirato stated that "R. Webster Neighbor and the Company agreed that he will continue to serve as Chief Financial Officer of the Company until the Company identifies and appoints a permanent replacement, at which point he will serve in the role of Chief Strategy Officer, reporting directly to the Company's Chief Executive Officer, with responsibility for activities related to corporate strategy, debt and equity capital markets, investor relations, real estate capital formation and investment."

80.    On July 15, 2023, Inspirato terminated Neighbor from employment with the Company. Defendants did not disclose this fact to investors for another five weeks.

81.    On August 21, 2023, Inspirato filed a Form 8-K with the SEC announcing that Neighbor and the Company had entered into a separation agreement and that Neighbor had "separated from employment with the Company effective July 15, 2023."

82.    The fact that Defendants failed to disclose to investors Neighbor's termination from the Company at the time it occurred on July 15, 2023 – coupled with the other facts alleged herein – is highly suspicious and adds to the strong inference of scienter alleged.

83.    These facts collectively demonstrate that Defendants acted with scienter when they made the false and misleading statements alleged herein.

### THE TRUTH BEGINS TO EMERGE

84.    On November 14, 2022, the Company filed its 8-K with the SEC signed by CFO Neighbor, stating, in pertinent part, as follows:

> Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.

On November 8, 2022, the Audit Committee (the "Audit Committee") of the Board of Directors of Inspirato Incorporated (the "Company") concluded, after discussion with the Company's management, that the Company's unaudited condensed consolidated financial statements as of and for the quarterly periods ended March 31, 2022 and June 30, 2022 (collectively, the "Non-Reliance Periods") included in the Quarterly Reports on Form 10-Q filed with the Securities and Exchange Commission (the "SEC") for the Non-Reliance Periods, should no longer be relied upon. This is due to the incorrect application of Accounting Standards Update (ASU) No. 2016-02, Leases (Topic 842) ("ASC 842") with respect to the assessment of right-of-use assets and liabilities, resulting in an understatement of both right-of-use assets and total lease liabilities of approximately 9% for each of the Non-Reliance Periods resulting in an understatement of total assets and total liabilities by approximately 5% for each of the Non-Reliance periods, and due to property-related and other expenses being under accrued in the first quarter, and over accrued in the second quarter, resulting in cost of revenue being understated by approximately 1% and overstated by approximately 5% in the first and second quarter, respectively. Similarly, any previously issued or filed reports, press releases, earnings releases, and investor presentations or other communications describing the Company's condensed consolidated unaudited financial statements and other related financial information covering the Non-Reliance Periods should no longer be relied upon.

* * *

The Company intends to restate the unaudited condensed consolidated financial statements for the Non-Reliance Periods as soon as practicable by filing amended Quarterly Reports on Form 10-Q for the Non-Reliance Periods. Accordingly, investors and others should rely only on financial information and other disclosures regarding the Non-Reliance Periods once the Company restates its unaudited condensed consolidated financial statements for the Non-Reliance Periods.

The above referenced misstatements are preliminary, unaudited and subject to further change in connection with the completion of the amended Quarterly Reports on Form 10-Q/A for the Non-Reliance Periods to be filed with the SEC.

The Audit Committee and management have discussed the matters disclosed in this Current Report on Form 8-K with the Company's independent registered public accounting firm, BDO USA LLP.

In connection with the restatements discussed above, the Company's management has re-evaluated the effectiveness of the Company's disclosure controls and procedures as of March 31, 2022 and June 30,

2022 and based on that evaluation, the Company's management has concluded its disclosure controls and procedures remained ineffective due to the unremediated material weaknesses previously disclosed in Item 4 "Controls and Procedures" in the Company's Quarterly Reports on Form 10-Q filed with the SEC for the Non-Reliance Periods. Management is developing a remediation plan for the material weaknesses.

85.    On November 14, 2022, the Company filed its Form12b-25 with the SEC

providing Notice of Late Filing, signed by CFO Neighbor, which stated, in pertinent part,

as follows:

Inspirato Incorporated (the "Company") will not, without unreasonable effort and expense, be able to file its Quarterly Report on Form 10-Q for the quarter ended September 30, 2022 (the "Third Quarter Report") with the Securities and Exchange Commission (the "SEC") within the prescribed time period due to delays in completion of the financial statements for the quarter ended September 30, 2022. The delay in the issuance of the Company's financial statements for the quarter ended September 30, 2022 is attributable to the pending restatement of the Company's condensed consolidated unaudited financial statements as of and for the quarters ended March 31, 2022 and June 30, 2022 (collectively, the "Non-Reliance Periods") included in the Quarterly Reports on Form 10-Q filed with the SEC for the Non Reliance Periods, as previously disclosed in the Company's Current Report on Form 8-K filed on November 14, 2022 with the SEC.

The Company's financial statements for the quarter ended September 30, 2022 cannot be finalized and the Third Quarter Report filed with the SEC until the restated financial statements for the Non-Reliance Periods are completed. The Company's review of its condensed consolidated unaudited financial statements for the Non Reliance Periods, including the determination of all required adjustments thereto, and the preparation of the restatements thereof, is ongoing. Although the Company expects to restate the unaudited condensed consolidated financial statements for the Non-Reliance Periods as soon as practicable by filing amended Quarterly Reports on Form 10-Q/A for each of the respective Non-Reliance Periods, for the reasons discussed above, the Company does not currently expect to file the Third Quarter Report within the timeframe specified by Rule 12b-25.

In connection with the restatements discussed above, the Company's management has re-evaluated the effectiveness of the Company's disclosure controls and procedures as of March 31, 2022 and June 30, 2022 and based on that evaluation, the Company's management has concluded its disclosure controls and procedures remained ineffective due to the unremediated material weaknesses previously disclosed in Item 4 "Controls and Procedures" in the Company's Quarterly Reports on Form

41

10-Q filed with the SEC for the Non-Reliance Periods. Management is developing a remediation plan for the material weaknesses.

86.    On this news, Inspirato's stock price fell $0.27 per share, or 11.89%, to close at $2.00 per share on November 14, 2022.

87.    On November 23, 2022, the Company filed its Form 8-K filed with SEC signed by CFO Neighbor, attaching a Press Release, disclosing the Company's receipt of a Notice from the Listing Qualifications Department of NASDAQ.  The 8-K stated, in pertinent part, as follows:

Item 3.01. Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard; Transfer of Listing.

On November 18, 2022, Inspirato Incorporated (the "Company") received a notice (the "Notice") from the Listing Qualifications Department of The Nasdaq Stock Market LLC ("Nasdaq") notifying the Company that it is not in compliance with the periodic filing requirements for continued listing set forth in Nasdaq Listing Rule 5250(c)(1) (the "Rule") as a result of its failure to file its Quarterly Report on Form 10-Q for the quarter ended September 30, 2022 (the "Third Quarter Report") with the Securities and Exchange Commission (the "SEC") by the required due date. The Notice stated that, under Nasdaq rules, the Company has 60 calendar days, or until January 17, 2023, to submit a plan to regain compliance with Nasdaq's continued listing requirements. If the plan is accepted, Nasdaq may grant an extension of up to 180 calendar days, or until May 15, 2023, to regain compliance. The Company can also regain compliance with Nasdaq's continued listing requirements at any time before January 17, 2023, by filing the Third Quarter Report with the SEC, and continuing to comply with Nasdaq's other continued listing requirements. The Company intends to file with the SEC the Third Quarter Report and regain compliance with Nasdaq's continued listing requirements as soon as practicable…

As previously disclosed in the Current Report on Form 8-K filed on November 14, 2022 by the Company, on November 8, 2022, the Audit Committee (the "Audit Committee") of the Board of Directors of the Company concluded, after discussion with the Company's management, that the Company's unaudited condensed consolidated financial statements as of and for the quarterly periods ended March 31, 2022 and June 30, 2022 (collectively, the "NonReliance Periods"), included in the Quarterly Reports on form 10-Q filed with the SEC for the Non-Reliance Periods, should no longer be relied upon. This is due to the incorrect

42

application of Accounting Standards Update (ASU) No. 2016-02, Leases (Topic 842) ("ASC 842") with respect to the assessment of right-of-use assets and liabilities, resulting in an understatement of both right-of-use assets and total lease liabilities of approximately 9% for each of the Non-Reliance Periods resulting in an understatement of total assets and total liabilities by approximately 5% for each of the Non-Reliance periods, and due to property-related and other expenses being under accrued in the first quarter, and over accrued in the second quarter, resulting in cost of revenue being understated by approximately 1% and overstated by approximately 5% in the first and second quarter, respectively. Similarly, any previously issued or filed reports, press releases, earnings releases, and investor presentations or other communications describing the Company's condensed consolidated unaudited financial statements and other related financial information covering the Non-Reliance Periods should no longer be relied upon…

The Company intends to restate the unaudited condensed consolidated financial statements for the Non-Reliance Periods as soon as practicable by filing amended Quarterly Reports on Form 10-Q/A for the Non-Reliance Periods. Accordingly, investors and others should rely only on financial information and other disclosures regarding the Non-Reliance Periods once the Company restates its unaudited condensed consolidated financial statements for the Non-Reliance Periods.

Also on November 14, 2022 the Company filed a Notification of Late Filing on Form 12b-25 disclosing that it would not, without unreasonable effort and expense, be able to file the Third Quarter Report with the SEC within the prescribed time period due to delays in completion of the financial statements for the quarter ended September 30, 2022. The delay in the issuance of the Company's financial statements for the quarter ended September 30, 2022 is attributable to the pending restatement of the Company's condensed consolidated unaudited financial statements for the Non-Reliance Periods.

The above referenced misstatements are preliminary, unaudited and subject to further change in connection with the completion of the amended Quarterly Reports on Form 10-Q/A for the Non-Reliance Periods to be filed with the SEC…

In connection with the restatements discussed above, the Company's management has re-evaluated the effectiveness of the Company's disclosure controls and procedures as of March 31, 2022 and June 30, 2022 and based on that evaluation, the Company's management has concluded its disclosure controls and procedures remained ineffective due to the unremediated material weaknesses previously disclosed in Item 4 "Controls and Procedures" in the Company's Quarterly Reports on Form

10-Q filed with the SEC for the Non-Reliance Periods. Management is developing a remediation plan for the material weaknesses.

88.    On November 23, 2022, the Company issued a Press Release in connection with the foregoing 8-K, which stated, in pertinent part, as follows:

… Inspirato Incorporated (NASDAQ: ISPO) (the "Company"), the innovative luxury hospitality company, today announced that on November 18, 2022, it received a notice (the "Notice") from the Listing Qualifications Department of The Nasdaq Stock Market LLC ("Nasdaq") notifying the Company that it did not comply with Nasdaq's Listing Rule 5250(c)(1) (the "Rule") for continued listing because it had not filed its Quarterly Report on Form 10-Q for the quarter ended September 30, 2022 (the "Form 10-Q") by the required due date.

89.    On this news, Inspirato's stock price fell $0.06 per share, or 3.21%, to close at $1.81 per share on November 25, 2022.

90.    On December 15, 2022, after market hours, the Company filed its Form 10-Q/A with SEC to amend its Quarterly Report on Form 10-Q for the quarter ended March 31, 2022, that was originally filed with the SEC on May 13, 2022 (the "Original Report"), signed by CEO Handler and CFO Neighbor.  The 10-Q/A stated, in pertinent part, as follows:

Inspirato Incorporated (the "Company") is filing this Amendment No. 1 on Form 10-Q/A (the "Amended Report") to amend its Quarterly Report on Form 10-Q for the quarter ended March 31, 2022, that was originally filed with the U.S. Securities and Exchange Commission (the "SEC") on May 13, 2022 (the "Original Report"), to restate certain items presented in the Original Report (the "Restatement"). This Amended Report includes a restatement of the Company's unaudited condensed consolidated financial statements as of and for the three months ended March 31, 2022 and amends certain other information in the Original Report as further described below. Background

As disclosed in the Company's Current Report on Form 8-K, filed with the SEC on November 14, 2022, the Restatement is to correct errors that resulted from (i) the incorrect application of Accounting Standards Update (ASU) No. 2016-02, Leases (Topic 842) ("ASC 842") with respect to the assessment of right-of-use assets and lease liabilities and (ii) the under accrual of liabilities and property related and other expenses as of March

44

31, 2022. The incorrect application of ASC 842 led to an understatement of $25 million of the right-of-use assets and total lease liabilities as of March 31, 2022. Separately, property-related and other expenses were understated by $0.3 million during the three-months ended March 31, 2022… In connection with the Restatement, the Company's management concluded that as of March 31, 2022, its disclosure controls and procedures remained ineffective at a reasonable assurance level due to the unremediated material weaknesses in its internal control over financial reporting previously disclosed in Part I, Item 4. "Controls and Procedures" of the Original Report…

Items Amended in this Amended Report

The following sections in the Original Report are revised in this Amended Report, solely as a result of, and to reflect, the Restatement

● Part I – Item 1. Financial Information

● Part I – Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations

● Part I – Item 4. Controls and Procedures

● Part II – Item 1A. Risk Factors

● Part II – Item 6. Exhibits and Signatures In addition, in accordance with Rule 12b-15 under the Securities Exchange Act of 1934, as amended, Part II, Item 6 of the Original Report has been amended to include the currently-dated certifications  from the Company's principal executive officer and principal financial officer as Exhibits 31.1, 31.2, 32.1 and 32.2…

Item 4. Controls and Procedures.

Evaluation of Disclosure Controls and Procedures

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated, as of the end of the period covered by this Amended Quarterly Report on Form 10-Q/A, the effectiveness of our disclosure controls and procedures (as defined in Rules 13a15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, or the Exchange Act). Based on that evaluation, and as a result of the material weaknesses in internal control over financial reporting described below, our Chief Executive Officer and Chief Financial Officer concluded that, as of March 31, 2022, our disclosure controls and procedures were not effective at the reasonable assurance level…

45

... As disclosed in the section titled "Risk Factors" in Part II, Item 1A and as of the end of the period covered by this Amended Quarterly Report on Form 10 Q/A, our material weaknesses are as follows:

● We have lacked a sufficient number of personnel with the appropriate level of knowledge and experience in the application of GAAP, including the adoption and ongoing accounting for leases under ASC 842, and in the design and implementation of internal controls and have not had the necessary business processes and related internal controls. Additionally, we did not design and maintain effective controls over our financial closing and reporting processes. This material weakness resulted in the restatement of our previously issued consolidated financial statements for the quarterly periods ended March 31, 2022, as described elsewhere in this Quarterly Report on Form 10-Q/A, and June 30, 2022 (collectively, the "Non-Reliance Periods") to correct errors that resulted from (i) the incorrect application of ASC 842 with respect to the assessment of right-of-use assets and lease liabilities and (ii) the under accrual of liabilities and property-related and other expenses as of March 31, 2022 and the over accrual of liabilities and property-related and other expenses as of June 30, 2022.

● We did not design and maintain effective controls relevant to the preparation of our financial statements with respect to information technology general controls ("ITGCs"). Specifically, the material weaknesses relating to ITGCs are due to a lack of the design and implementation of certain ITGCs related to our financial applications and data being adequately restricted.

… We have identified and are currently working to remediate material weaknesses in internal control over financial reporting related to our financial closing and reporting process and to our information technology general controls ("ITGCs")…

The following material weaknesses remain unremediated as of March 31, 2022:

● We have lacked a sufficient number of personnel with the appropriate level of knowledge and experience in the application of GAAP, including the adoption and ongoing accounting for leases under ASC 842, and in the design and implementation of internal controls and have not had the necessary business processes and related internal controls. Additionally, we did not design and maintain effective controls over our financial closing and reporting processes. This material weakness resulted in the restatement of our previously issued consolidated financial statements for the Non-Reliance Periods to correct errors that resulted from (i) the

46

incorrect application of ASC 842 with respect to the assessment of right-of-use assets and lease liabilities and (ii) the under accrual of liabilities and property-related and other expenses as of March 31, 2022 and the over accrual as of June 30, 2022.

● We did not design and maintain effective controls relevant to the preparation of our financial statements with respect to ITGCs. Specifically, the material weaknesses relating to ITGCs are due to a lack of the design and implementation of certain ITGCs related to our financial applications and data being adequately restricted. We continue to remediate the material weaknesses identified. We are committed to continuing to improve our internal control over financial reporting and will continue to review and improve our internal control over financial reporting controls and ITGCs. described above. We have hired a number of key appropriately qualified personnel with the appropriate level of knowledge and experience in the application of GAAP, including four Certified Public Accountants with one designated as the Lead Property Accountant. We have also engaged third party consultants to assist with the design and implementation of ITGCs, more specifically designing additional change management and access controls for our relevant IT applications to further restrict privileged access and implementing controls to review activities for those users who have privileged access. In addition, due to the material weaknesses in internal control over financial reporting, we have also determined that our disclosure controls and procedures are ineffective. …[A]s a result of the material weaknesses and related restatements due to the matters descried above, we were not able to timely file our Quarterly Report on form 10-Q for the period ended September 30, 2022 (the "Third Quarter Report") and received a delisting notice from Nasdaq…

91.    On this news, Inspirato's stock price fell $0.10 per share, or 6.58%, to close at $1.41 per share on December 16, 2022.

92.    As a result of Defendants' wrongful acts and half-truths and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**CLASS ACTION ALLEGATIONS**

93.    Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all those who purchased the Company's securities during the Class Period, and who were

47

damaged thereby (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have, or had, a controlling interest.

94. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

95. Plaintiff's claims are typical of the claims of the members of the Class, since all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law alleged herein.

96. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

97. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants' acts constituted violations of the federal securities laws;

48

(b)      whether Defendants' statements made to the investing public during the Class Period misrepresented material facts concerning the Company's business, operations, and financial condition;

(c)      whether the price of the Company's securities was artificially inflated during the Class Period; and

(d)      to what extent the members of the Class have sustained damages and the proper measure of damages.

98.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  Additionally, there will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

99.      During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the Company's securities.  Defendants' conduct, moreover, operated as a fraud or deceit on Class Period purchasers of the Company's securities by failing to disclose, and misrepresenting, the adverse facts detailed herein.   As Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of the Company's securities declined significantly as the prior artificial inflation dissipated from the Company's stock price.

49

100.    As a result of the purchases of the Company's securities during the Class Period, Plaintiff and the other members of the Class suffered economic loss (damages) under the federal securities laws.  Defendants' false and misleading statements had the intended effect, and caused, the Company's securities to trade at artificially inflated levels throughout the Class Period.

101.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of the Company's business and prospects. As the truth regarding the Company was revealed to the market, the price of the Company's securities fell significantly.  These declines removed the inflation from the price of the Company's securities, causing real economic loss to investors who purchased the Company's securities during the Class Period.

102.    The declines in the price of the Company's securities after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in the Company's securities negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic, or industry factors, or by Company-specific facts unrelated to defendants' fraudulent conduct.

103.    The economic loss (damages) suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of the Company's securities and the subsequent significant decline in the value of the Company's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

104.   At all relevant times, the market for the Company's securities was an efficient market for the following reasons, among others:

(a)   The Company's securities met the requirements for listing, and was listed and actively traded on, NASDAQ, a highly efficient, electronic stock market;

(b)   As a regulated issuer, the Company filed periodic public reports with the SEC and NASDAQ;

(c)   The Company regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   The Company was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

105.   As a result of the foregoing, the market for the Company's securities promptly digested current information concerning the Company from all publicly available sources and reflected such information in the prices of the Company's securities.  Under these circumstances, all purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of the Company's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

106.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements alleged herein.  Many of the specific statements alleged herein were not identified as "forward-looking statements" when made, and thus are not entitled to protection under the safe harbor provision.    Additionally, to the extent that there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.    Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements alleged herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

## COUNT I
### Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against All Defendants

107.    Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

108.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew, or were deliberately reckless in not knowing, were misleading.  These statements were false and misleading because they contained misrepresentations and failed to disclose

52

material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

109.    To the extent that the claims alleged herein are based upon the omission of information, such omissions were made in connection with the misrepresentations and misleading half-truths alleged herein and were not based upon pure omissions.

110.    Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact/and or omitted to state material facts necessary to make the statements made not misleading; and (3) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

111.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's securities. Plaintiff and the Class would not have purchased the Company's securities at the prices they paid – or at all – if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

112.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT II
**Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

113.    Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

114.    The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of

53

their high-level positions, and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and/or intimate knowledge of the Company's statements filed with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements alleged to be false and misleading herein.

115.    The Individual Defendants, moreover, were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged to be false and misleading herein.  The Individual Defendants were provided with, or had unlimited access to, such documents and statements prior to, and/or shortly after these statements were issued, and therefore had the ability to prevent the issuance of the statements and/or cause the statements to be corrected. Additionally, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and had the power to control or influence the particular transactions giving rise to the securities violations.

116.    The Individual Defendants all had ultimate authority over the Company's statements, including controlling the content of such statements and whether and how to communicate such statements to the public.

117.    By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff, and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated:  November 5, 2024

GLANCY PRONGAY & MURRAY LLP

By:  */s/ Ex Kano S. Sams II*
Robert V. Prongay
Ex Kano S. Sams II
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
rprongay@glancylaw.com
esams@glancylaw.com
clinehan@glancylaw.com

*Attorneys for Lead Plaintiff Ilan Bouzaglo*

55

THE LAW OFFICES OF FRANK R. CRUZ
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

*Additional Counsel for Lead Plaintiff*

## PROOF OF SERVICE

I hereby certify that on this 5th day of November, 2024, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*s/ Ex Kano S. Sams II*
Ex Kano S. Sams II
